## THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Crim. No. 21-474 (ADC)** |
| **ANGEL PEREZ-OTERO,** | |
| **Defendant.** | |

## <u>OPINION AND ORDER</u>

Before the Court is defendant Ángel Pérez-Otero's ("Pérez-Otero" and/or "defendant")

motions filed on February 6 and February 10, 2023. **ECF No. 41** and **46**. Pérez-Otero requests

that the Court institute protective measures, in the form of a continuance of trial and the

exclusion of certain evidence, due to alleged adverse pretrial publicity caused by the United

States of America's ("government") inclusion of certain photographs in a motion to support its

request for a $50,000 secured bond. *See*, **ECF No. 6**. Pérez-Otero also seeks an amendment or

clarification to the protective order initially requested by the government and granted by this

Court on January 24, 2023. **ECF Nos. 34** and **38**. The government filed a brief response to Pérez-

Otero's motion at **ECF No. 41** on February 6, 2023. **ECF No. 42.**

On February 9, 2023, the Court denied the request for continuance of trial at **ECF No. 41**.

*See*, **ECF No. 45**. On February 15, 2023, the Court entered a Protective Order. **ECF No. 50**.

Therein, the Court provided notice that an Opinion and Order with its reasons for its decision

would follow. *Id*. A few days later, defendant filed a "Notice to the Court And Or Motion to Supplement" **ECF No. 52** providing a "clarification." *Id*., at 1. The government then sought leave to respond to both defendant's motion *in limine* and this latest supplement, which the Court granted. **ECF Nos. 56** and **57**. The government later filed its response in opposition. **ECF No. 58**.

As anticipated, in the present Opinion & Order, the Court provides its reasons for its decision to deny defendant's request for continuance at **ECF No. 41** the *in limine* motion at **ECF No. 46**, and further rules on the additional relief requested by Pérez-Otero.

## I.    Introduction

Pérez-Otero's motion at **ECF No. 41** (which is far from a paragon of clarity) requests two things. First, that the Court continue his trial, scheduled to begin on March 13, 2023, until the threat of "prejudicial news prior to trial" abates.[1] Second, Pérez-Otero requests and amendment to the Protective Order so as to permit him to "use the evidence to be provided by the government for its discussion with potential witnesses for the defense." *See*, **ECF No. 41**, at 5. Pérez-Otero explicitly stated that he was "not requesting a change of venue, as he is not waiving the right to a jury of his peers." *Id.* The government, for its part, argues that the photographs object of Pérez-Otero's motion do not clearly depict him,[2] as he is wearing a mask in these photographs, and that it cannot be said that the photographs (which the government intends to

---

[1] Pérez-Otero argues that the government's public filing of two photographs allowed these to be disseminated by the media to his prejudice. The two photos, depict two individuals exchanging a package purportedly, the monies provided to defendant as related to the bribery charges.

[2] In its response to Pérez-Otero's motion *in limine. See,* **ECF No. 59**, at 1, the government later conceded that a witnesses will testify that the photographs depict Pérez-Otero.

introduce at trial) prejudiced him "to the point that he cannot receive a fair trial." **ECF No. 42**, at 2. Addressing defendant's second request, the government states that it has no objection to allowing Pérez-Otero to review the discovery materials "with witnesses in the case in order to prepare and investigate in preparation for trial," given that the January 24th protective order's own terms allow him to do so. *Id.*[3]

Moreover, in his recent motion *in limine* at **ECF No. 46**, Pérez-Otero requests that the Court preclude the government from utilizing at trial the same photographs (and the videos from which they originate) that form the basis of his request for continuance at **ECF No. 41.** He rests his claim on the same allegations of adverse pretrial publicity that forms the substance of his request for continuance.

Finally, in his supplement, defendant requests the Court to search and take judicial notice of news articles published by Puerto Rico newspapers as well as "all other publications of the photographs," in what the Court can only construe as an attempt to shift defendant's burden of proof to the Court. **ECF No. 52**, at 2. *See, U.S. v. Moreno Morales*, 815 F.2d 725, 739 (1st Cir. 1987) (describing such burden as "significant and heavy.").

After a careful analysis, the Court **DENIES** Pérez-Otero's requests at **ECF Nos. 41**, **46** and **52**. As a threshold matter, the Court concludes that defendant's motion for continuance is

---

[3] As with defendant's motion, the government's skeletal, two-page response (which is mis-titled) leaves much to be desired. The government should have filed more than a same-day, barebones opposition (largely limited to offering further briefing) in response to a claim that, regardless of its merits, may form the basis of a challenge on appeal. This omission adds to the government's prior statement, conceded as erroneous in its response, that defendant had consented to the entry of a protective order when he had not. *See*, **ECF No. 42**, at 1. The Court expects more diligence from the government going forward.

patently untimely and fails to meet the applicable legal standard. Pérez-Otero does not offer any explanation as to why he waited **more than a year** after the photographs were made public to request any relief from this allegedly improper disclosure. His silence on this point is deafening, and it begs the question of whether the motion reflects a calculated tactic rather than an earnest concern. In any case, what this omission shows is a complete lack of diligence in moving to remedy the alleged prejudice.

As to the requests for a continuance and to preclude the use of the photographs at trial, which essentially rely on the same grounds, they amount to mere threadbare attempts to obtain relief, supported by nothing more than an unverified, unsigned, and unspecific report purportedly prepared by a party-retained media research company. This report, were it be given any weight, only shows that the complained-of photographs have shown up in social media posts and online media outlets—and mostly on the days surrounding his arrest, which was well over a year ago. Pérez-Otero fails to provide any context in which these photographs have been used by the media, a failure that impedes this Court from determining whether the nature of the publicity is sensational or merely factual. The photographs themselves, which is all the Court is given to analyze, are not inherently prejudicial to Pérez-Otero.[4]

Finally, Pérez-Otero's request for an amendment to the protective order at **ECF No. 34** is a *non-sequitir*. The protective order's own terms allow him to share discovery materials with

---

[4] The Court notes that the government used these photographs in the context of a motion filed pursuant to 18 U.S.C. § 3142(g), it having a duty to support its position regarding bail. Pérez-Otero does not cite to any statute or rule that requires the government to file this evidence under seal or restriction, nor indicates what precluded the defense from requesting the sealing or restriction of public access to such photographs.

potential witnesses to investigate and prepare his case, so long as those individuals abide by its terms. Defendant has requested no additional relief in this regard.

In sum, Pérez-Otero has failed to establish that the publicity surrounding the photographs is inflammatory and prejudicial to an extent that his right to a fair trial would be in peril. These failures alone justify the denial of the motion. However, for sake of completeness, the Court reviews the applicable legal standard and applies it to Pérez-Otero's allegations on adverse publicity. The review confirms the Court's decision to deny continuance of trial.

In reaching its decision, explained in detail below, the Court is mindful that some of the alleged publicity that defendant complains of in his motion (which, again, is presented without any context by which to evaluate its nature) was likely being generated by defendant's own actions in this case, such as the recent filing of a motion to dismiss the indictment. **ECF No. 30**. In that context, and without accepting defendant's open-ended invitation at **ECF No. 52** for the Court to investigate the entire universe of media coverage of his case, it appears that Pérez-Otero's counsel, for example, has made recent media appearances to discuss recent filings and defense theories. These actions can logically be expected to generate publicity.[5]

II.    **Legal Standard**

A.    **Pretrial Publicity and Prejudice**

In *Nebraska Press Assoc. v. Stuart*, 427 U.S. 539 (1976), the Supreme Court observed that:

---

[5] The Court strongly advises all parties, including Pérez-Otero and his attorneys, to exercise utmost caution, discretion, and restraint when speaking or communicating to the press about this case, so as to not, intentionally or otherwise, affect the integrity of the proceedings at bar. Such conduct will not be tolerated. *See* **ECF No. 50**.

> **[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial**. The capacity of the jury eventually impaneled to decide the case fairly is influenced by the **tone and extent** of the publicity, which is in part, and often in large part, **shaped by what attorneys**, police, and other officials do to precipitate news coverage."

427 U.S. at 554-55 (emphasis added). The First Circuit, in *U.S. v. Moreno Morales*, 815 F.2d 725 (1st Cir. 1987), established a three-factor standard to review on appeal both due process and Sixth Amendments claims based on adverse pretrial publicity surrounding a criminal case:

> [A defendant] must demonstrate at least one of the following: (1) the trial itself was conducted in a "circus like" atmosphere; (2) the actual jurors who sat on the case possessed fixed opinions that prevented them from judging impartially the guilt or innocence of the defendants; or (3) the community was so saturated with inflammatory publicity as to call into question the jurors' assertions and require us to presume their partiality.

*U.S. v. Moreno Morales*, 815 F.2d at 731. In addition, the First Circuit observed that:

> Courts have held that a motion for a change of venue is the preferred remedy where a community has been saturated with publicity adverse to the defendant," and that "if an accused expressly declines to seek a venue change… he carries a significantly heavier burden to show that widespread community publicity concerning the crimes of which he is charged render his trial presumptively unfair…. Society cannot be placed in a position where it is unable to bring to trial the violators of its laws."

*Id.*, at 739 (citations omitted).

From this standard, the First Circuit has further distilled a test to evaluate motions by defendants to transfer venue or continue trials due to prejudicial pretrial publicity. In *U.S. v. Orlando-Figueroa*, 229 F.3d 33 (1st Cir. 2000), citing its discussion in *Moreno Morales* on publicity, it instructed courts evaluating whether to grant a motion for continuance to "determine if prejudice exists from the publicity." 229 F.3d at 42 (*citing Moreno Morales*, 815 F.2d at 733-34); *see*

*also*, *United States v. Dubón-Otero*, 76 F.Supp.2d 161, 165 (D.P.R. 1999) (same). Where, as here, a jury has not yet been selected and seated, "[p]rejudice may be presumed where inflammatory publicity has so saturated a community as to render it difficult to draw an impartial jury…." *Orlando-Figueroa*, 229 F.3d at 43 (*citing U.S. v. Rodríguez–Cardona,* 924 F.2d 1148, 1158 (1st Cir. 1991)); *see also, Dubón-Otero*, 76 F.Supp.2d at 166 (relying on *Moreno Morales* to apply a "presumption of prejudice" analysis where the case remained in the pretrial stage and prior to impaneling a jury).[6]

A finding of presumed prejudice is reserved only for "extreme cases." *U.S. v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007). In order to meet this standard, "the publicity must be both extensive *and* sensational in nature." *U.S. v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (emphasis in original). "Mere exposure of the potential jury pool to news reports regarding the crime does not, in and of itself, result in an inability to select an impartial jury." *U.S. v. Pérez-González*, 445 F.3d 39, 46 (1st Cir. 2006).

In performing this analysis, both the Supreme Court and the First Circuit survey and compare the facts of similar cases to the case before them. *See, e.g., Rodriguez-Cardona*, 924 F.2d

---

[6] The Court is aware that a second approach, often referred to as an "actual prejudice" analysis, can be used to determine prejudice. However, this approach focuses on whether "enough jurors admit to prejudice to cause concerns as to any avowals of impartiality by the other jurors." *United States v. Casellas-Toro*, 807 F.3d 380, 386 n.3 (1st Cir. 2015) (citations omitted). The Court will not engage in this analysis because the case at bar is still in a pretrial stage and no jurors have been selected, making such analysis an impossibility. *See, In re Tsarnaev*, 780 F.3d 14, 24 n.11 (1st Cir. 2015) (explaining impossibility of making an actual prejudice claim where "the jury is in the process of being selected and has not been seated for trial."); *see also, U.S. v. Keleher*, No. 20-cr-019 (FAB), 2020 WL 4784749 at *4 n.3 (D.P.R. Aug. 17, 2020) ("Actual prejudice is not at issue here; no jury has been impaneled and jury selection has not begun.").

at 1158 (comparing facts to those in *Angiulo, U.S. v. Medina-Maldonado*, 761 F.2d 12 (1st Cir. 1985), and *Moreno Morales*); *Medina-Maldonado*, 761 F.2d at 19 (comparing facts to those in *Irvin v. Dowd*, 366 U.S. 717 (1961), *Rideau v. State of Louisiana*, 373 U.S. 723 (1963), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)); *Moreno Morales*, 815 F.2d at 734-39 (comparing facts to those in *Estes v. State of Texas*, 381 U.S. 532 (1965), *Irvin, Rideau, Sheppard, Murphy v. Florida,* 421 U.S. 794, 803 (1975), and *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952)).

### B.    Requests for Continuance of Trial

A trial court possesses broad discretion to decide a continuance motion. *Misla-Aldarondo*, 478 F.3d at 60 (*citing United States v. Rodríguez–Marrero,* 390 F.3d 1, 21–22 (1st Cir.2004). "Among the factors to be considered… are the amount of time necessary for trial preparation, the amount of time actually available for preparation, the defendant's diligence, the inconvenience to the court and other parties, the likely utility of a continuance, and any unfair prejudice caused by the denial." *Orlando–Figueroa,* 229 F.3d at 40.

### III.   Discussion

From the outset, the Court agrees with Pérez-Otero that this case is one of public interest that may attract media coverage, and it is mindful that it may take protective measures, including a continuance, to ensure the fairness of a trial "even when they are not strictly and inescapably necessary." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 378 (1979). However, Pérez-Otero failed (by a wide margin) to establish a presumption of prejudice with regard to the alleged pretrial publicity surrounding his case. As explained below, Pérez-Otero has failed to

establish that the complained-of publicity is both extensive and sensational enough to warrant such presumption. And this is particularly true when compared to the applicable case law, as well as to prior cases arising from this District involving public corruption charges. Pérez-Otero's claim of adverse pretrial publicity, in other words, falls way short of the mark.

A.     Pérez-Otero's Argument

Pérez-Otero's argument relies on the disclosure by the government of two photographs purportedly showing him engaging in the illegal acts he is charged with under the indictment—accepting bribery, extorsion, and conspiracy to commit these (18 U.S.C. §§ 371, 666(a)(1)(B) and (2), and 1951. These photographs, according to Pérez-Otero, "were extensively disseminated in [sic] the internet, newspapers, television and even radio shows that transmit images over the internet." **ECF No. 41**, at 1. Pérez-Otero alleges that "the photographs[] intensified media coverage and created a public impression of defendant's guilt," and that "[t]he use of the photographs has been so pervasive and commented in newspapers, [ ] radio, television, podcasts, etc., that it prompts our request…." *Id.*, at 2 and 3.

In support, Pérez-Otero included as an exhibit to his motion an unsigned "preliminary media report" prepared by a retained research consultant, which includes a list of keyword and image search results purporting to show instances in which the photographs in question have appeared on social media (Facebook, Twitter, YouTube) and online media websites. **ECF No. 41-1**. The keywords used were "Angel Pérez," "Guaynabo," "*Corrupcion*" (corruption), "*soborno*" (bribery), "FBI," "*alcalde*" (mayor), and "Santamaria." *Id.* The document does not

detail which results correspond to which keywords, nor is it clear as to whether the search was conducted based on the images or the keywords alone, or a mixture of both (though it appears to suggest so.) Nor does it provide the context in which the images were used. It also does not shed light on whether any print newspaper, radio or television station, or other non-digital media disseminated the photographs at issue.

According to this unverified report, on December 9, 2021—the date of Pérez-Otero's arrest and the filing date of the government's motion—at least 17 Twitter accounts, 41 Facebook accounts, 5 YouTube accounts, and 17 online media websites used the photographs. **ECF No. 41-1**, at 2-6. From such date until the end of 2021, the photographs come up only 8 additional times in the report. *Id.* In the entire calendar year of 2022, the report only identifies 4 such instances. *Id.*, at 2 and 6. And from January 9 to 13, 2023 (the only 2023 dates included in the report), there are only 11 results—8 of them from Twitter accounts and 3 from online media websites. *Id.*, at 2 and 5. These dates closely track Pérez-Otero's filing of his motion to dismiss the indictment on January 9, 2023, and the Pretrial Conference held on January 12, 2023. *See*, **ECF Nos. 30** and **32**. As such, from December 9, 2021 up to the end of December of 2022, the pretrial publicity decreased and that of January of 2023 responds to motions filing.

The above-described allegations and media report compose the entirety of Pérez-Otero's support for his request for a continuance.

**B.**     **Presumption of Prejudice: Whether the Publicity is Extensive and Sensational**

A presumption of prejudice applies where a defendant can show that the complained-of publicity is inflammatory and "has so saturated a community as to render it difficult to draw an impartial jury…." *Orlando-Figueroa*, 229 F.3d at 43. The defendant must establish that said publicity is both **extensive** and **sensational** in nature. *Angiulo*, 897 F.2d at 1181. After analyzing both factors and reviewing case law from the Supreme Court as well as public corruption cases arising from this District, the Court finds that Pérez-Otero failed to meet his burden.

**1.**     **Extensiveness of the Publicity**

Pérez-Otero's motion posits that the photographs in question have been "extensively disseminated" on the internet, in newspapers, on television and on radio shows that have an online presence. *See*, **ECF No. 41**, at 1. The Court does not doubt that this case has garnered media attention, given the public nature of the charges against Pérez-Otero, a former public official. But his bald, unsupported assertion as to the extensiveness of this publicity is fatal.

The media research report attached to Pérez-Otero's motion is a mere list of search results in which the photographs have allegedly appeared on social media and the internet. Even though it does include some measure of public reach through social media, it is utterly lacking in context. For example, the list includes a entry for a Facebook account named "TeleMundo" whose use of the photos on "12/09/2021" garnered "434 likes[,] 127 shares[, and] 110 comments." **ECF No. 41-1**, at 4. It does not state when the social media article or post was accessed or viewed or otherwise interacted with, or how many of these are repeat interactions by the same user or

distinct interactions from different users. The same applies to the entry with the most "Interactions/Views" in the report: a YouTube account named "Molusco TV" dated "12/9/21" which purportedly garnered "51k views[,] 139 comments[, and] 816 likes." *Id.*, at 6. There is simply no way for this Court to reliably ascertain the extent of the complained-of publicity from Pérez-Otero's threadbare proffer, which rests solely on an unverified (and unsigned) report prepared by a party-retained research consultant. Any determination by this Court as to the extensiveness of the use of the photographs in question would be mere speculation.[7]

### 2.    Nature of the Publicity

Pérez-Otero argues that the media's use of the photographs has "created a public perception of defendant's guilt." **ECF No. 41**, at 2. However, to be perfectly clear, Pérez-Otero does not characterize the complained-of publicity as either sensational or inflammatory, and he does not otherwise provide this Court with any context by which to gauge the media's use of the photographs in question. The only detail that can be gleaned from his submission is that these photographs appear in conjunction with one or more of the following search terms: "Angel Perez," "Guaynabo," "Corrupcion," "soborno," "FBI," "alcalde," and "Santamaria." **ECF No. 4-1**, at 1. However, these are all neutral terms that can indicate factual, non-inflammatory

---

[7] Justice Clark, in his dissent in *Rideau v. State of Louisiana,* 373 U.S. 723 (1963)—a case discussed more fully below— observed the difficulty of relying on approximate viewership numbers based on sampling: "[A]ssuming arguendo the accuracy of the figures given, there is no way of determining whether those figures are mutually inclusive or whether they represent different viewers on the different occasions." 373 U.S. at 731-32 (Clark, J., dissenting).

reporting on the fact that Pérez-Otero has been charged with, among other crimes, bribery or "*soborno.*"[8]

Given this lack of clarity and context, the Court analyzed the photographs to determine if they were, on their face, sensational or inflammatory. A description, therefore, is both helpful and necessary to the Court's analysis.

These two photographs, to wit, show two people seated in a vehicle. In both photographs, one individual appears wearing a surgical mask on his face. One of the photographs shows this individual grabbing with his hand a white, envelope-sized packet clasped by a rubber band from the hand of another individual. The packet's contents are unseen, but its shape suggests that its contents are rectangular, and its girth that it is filled to capacity. In the other picture, a masked individual is again pictured grabbing a thick, white packet from another, whose face is visible. Not much more can be gathered from these images. *See*, **ECF No. 6**, at 5.

The Court does not consider these pictures to be sensational or inflammatory on their face. Many interpretations can be made of these pictures standing alone, and Pérez-Otero failed to provide any context by which to measure whether the media reporting is sensational, inflammatory, or, on the other hand, "straightforward, unemotional, factual accounts of events and of the progress of official and unofficial investigation." *Medina-Maldonado*, 761 F.2d at 19. In the latter case, they would "furnish no basis for a court to presume that an unbiased jury could

---

[8] Indeed, the term "Santamaria" presumably relates to an individual publicly identified as someone who has cooperated with the government in several other ongoing public corruption cases. Wherefore the results of this report may not exclusively refer to defendant. Likewise, the results for the term "*alcalde*" (mayor) may well relate to the prosecution of other mayors currently being prosecuted at the federal level.

not be selected at the time and place of a trial." *Id.*, *citing United States v. McNeill*, 728 F.2d 5, 9 (1st Cir. 1984). Where the publicity is "factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." *Angiulo*, 897 F.2d 1181. From Pérez-Otero's motion, there is nothing to suggest that the publicity arising from these photographs has been either inflammatory or sensational to the point that a presumption of prejudice should be found. More so, it appears that the photographs do not constitute the government's core evidence (presumably, the testimony of the cooperating individual enabling the videos and recordings) but rather serve to corroborate a prospective witness' testimony.

### 3.   Comparison with Other Cases[9]

#### i.   Supreme Court Precedent: *Rideau* and *Irvin*

The Supreme Court has found a presumption of prejudice only in extreme cases. *Skilling v. U.S.*, 561 U.S. 358, 381 (2010) ("A presumption of prejudice, our decisions indicate, attends only the extreme case."). In two of these, *Estes v. State of Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court presumed prejudice due to media interference during trial, not because of inflammatory publicity at the pretrial stage. This, by itself, is sufficient to make them factually inapplicable to the situation raised by Pérez-Otero. *See*, *Skilling*, 561 U.S. at 382 n.14. In addition, *Nebraska Press Assoc. v. Stuart*, 427 U.S. 539 (1976), cited by Pérez-Otero in

---

[9] In both his motion for continuance and his motion *in limine*, defendant averred that "a review of caselaw in the Supreme Court… the First Circuit and this District, comprises decisions in which the very nature of the charges and the defendants (e.g., public figures) involves, generate an excessive publicity." **ECF No. 41** at 4; **ECF No. 46** at 6. Defendant did not care to include any such "review" in his motions. Independently, the Court has undertaken such review and found defendant's statement, hyperbole aside, to be significantly inaccurate, at best.

his motion, is also factually inapposite, as the issue there was not whether a defendant had been subjected to an unfair trial, but whether a trial court could prohibit the press from reporting on certain aspects of the case to protect the defendant's right to a fair trial from the risk of adverse pretrial publicity. 427 U.S. at 543.

The other often-cited case regarding adverse pretrial publicity is *Rideau v. State of Louisiana*, 373 U.S. 723 (1963).[10] There, the Supreme Court reversed a state court conviction due to the trial court's refusal of a transfer of venue request.[11] The facts of that case are particularly stark: the defendant there was arrested on charges of kidnapping, robbery, and murder based on events that occurred in Calcasieu Parish in Lake Charles, Louisiana—population: 150,000. *Rideau*, 373 U.S. at 724. During the three days following his arrest, a television station broadcasted a filmed interrogation described by the Supreme Court as thus: "What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Id.*, at 725. The defendant was arraigned two weeks later and eventually found guilty. In reversing the conviction, the Supreme Court held:

---

[10] *Rideau* was considered by the First Circuit in *Moreno Morales* to be "the only case in which the Supreme Court has reversed a conviction based solely on the egregiousness of pretrial publicity and without specific proof that the jurors who sat—or the trial itself—were prejudiced thereby." *Moreno Morales*, 815 F.2d at 735. The First Circuit also recently referred to *Rideau* as "[t]he 'foundation precedent' for presumed-prejudice analysis." *Casellas-Toro*, 807 F.3d at 386 (*citing Skilling*, 561 U.S. at 379).

[11] In *Irvin*, defendant has clearly stated he is not seeking a change of venue. *See*, **ECF No. 41**, at 5. *Rideau* and other cases discussed below (*i.e.*, *Irvin, Misla-Aldarondo, Kourí-Pérez, Dubón-Pérez, Keleher, Moreno Morales, Casellas-Toro*) that deal with change of venue requests exclusively or in conjunction with requests for continuance are only discussed insofar as the standard for finding a presumption of prejudice in both instances is essentially the same.

> [I]t was a denial of due process of law to refuse the request for a change of venue,
> after the people of Calcasieu Parish had been exposed **repeatedly and in depth** to
> the spectacle of Rideau personally confessing in detail to the crimes with which he
> was later to be charged. For anyone who has ever watched television the
> conclusion cannot be avoided that this spectacle, to the tens of thousands of people
> who saw and heard it, in a very real sense was Rideau's trial—at which he pleaded
> guilty to murder. Any subsequent court proceedings in a community **so
> pervasively exposed** to such a spectacle could be but a hollow formality.

*Rideau*, 373 U.S. at 726 (emphasis added).[12]

Two years prior to *Rideau*, the Supreme Court had overturned a murder conviction and death sentence upon federal habeas review in *Irvin v. Dowd*, 366 U.S. 717 (1961), where the petitioner had obtained an initial transfer of venue request to an adjacent county but was refused a second one. The Supreme Court examined, in detail, "the then current community pattern of thought" through the community's "popular news media" and found a "pattern of deep and bitter prejudice." *Irvin*, 366 U.S. at 725-27. It found both extensive and inflammatory press coverage of the case before trial and concluded that "the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice" in the venue's community. *Id.*, at 726.[13] After confirming its observation through an examination of the jury's *voir dire*, it reversed the conviction.

---

[12] As noted previously, Pérez-Otero has clearly stated he is not requesting a change of venue. *See*, **ECF No. 41**, at 5.

[13] In *Irvin* the petitioner attached "46 exhibits which… indicate[d] that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial." *Irvin*, 366 U.S. at 725. These newspapers circulated in "approximately 95% of the dwellings" in the venue, and the radio and TV stations of the adjacent county "likewise blanketed that county, [and] also carried extensive newscasts covering the same incidents." *Id.* The adverse publicity included, among other things, "stories [that] revealed the details of [petitioner's] background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war." *Id.* The day before trial, the newspapers reported that the petitioner had orally confessed to a total of six killings, including the victim in the case. *Id.*

Evidently, neither *Rideau* nor *Irvin* provide Pérez-Otero much (if any) aid in his request for continuance. The facts in both cases involved a level of pervasive and inflammatory media coverage that, simply, is absent from the record here. There is not even a hint of an indication that would suggest that the Puerto Rican community has been pervasively exposed to any publicity that would make "any subsequent court proceeding… a hollow formality." *Rideau*, 373 U.S. at 726. Neither is there any indication that the press coverage of the photographs in question here is anything like the inflammatory coverage described in *Rideau* and *Irvin* over his alleged confessions or personal background. 366 U.S. at 725-27. It cannot be said that the publicity alleged by defendant Pérez-Otero is as extensive or scandalous as that described in *Rideau* and *Irvin.* In sum, the Court finds no parallel between defendant's claim of prejudice and the facts of these cases.

> ii.      **Cases arising from this District that concern publicity surrounding public corruption trials**

Absent any helpful yardstick in our Supreme Court's repertoire (and given Pérez-Otero's failure to adduce to any), the Court turns to public corruption cases arising from this District where a continuance was requested based on adverse pretrial publicity.

The Court begins with what appears to be the most analogous case. In *U.S. v. Orlando-Figueroa*, 229 F.3d 33 (1st Cir. 2000), the First Circuit confirmed the District Court's decision to deny a motion for trial continuance based on adverse pretrial publicity. There, the defendants were convicted by a jury of conspiracy and of corruptly soliciting a $2.5 million bribe in relation to a municipal contract for hurricane debris cleanup in Toa Baja, Puerto Rico. 229 F.3d at 37-38.

One of the defendants was the former mayor of the municipality. *Id.* On appeal, the defendants argued that the District Court erred in denying a continuance where "there were 153 articles in seven newspapers on the topic in the 60 days after their arrest, and numerous broadcast accounts." *Id.*, at 42. The District Court had found that "although there was substantial publicity surrounding the trial, there was nothing particularly inflammatory about it, and that the coverage ran the gamut from maligning to championing to defending to praising to simply reporting on the defendant's situation.'" *Id.*, at 43 (internal quotation marks omitted). The First Circuit denied the challenge and confirmed the conviction, noting that the defendants did not present any evidence on appeal that would contravene this finding or indicative that the pretrial publicity was "particularly inflammatory or prejudicial." *Id.*

In *U.S. v. Misla-Aldarondo*, 478 F.3d 52 (1st Cir. 2007), the defendant, a former Speaker of the Puerto Rico House of Representatives, was indicted for extorsion, money laundering, and witness tampering arising from a scheme in which he was paid to secure regulatory approval for the purchase of a state hospital. 478 F.3d at 56. Having been convicted on some but not all counts, he appealed on several grounds including the District Court's denial of his request for change of venue, or a continuance, based on adverse pretrial publicity. *Id.*, at 57-58. In its decision affirming the conviction, the First Circuit observed that "[t]he publicity surrounding this case was undoubtedly extensive," highlighting the defendant's former position as a public official and that he "was simultaneously being investigated on charges of sexual assault on a minor." *Id.*, at 59. In support of his request to both transfer venue and continue the trial, the

defendant had "provided the district court with, by his count, over 180 articles attempting to show" that the community was saturated with inflammatory publicity about the trial and the sexual assault investigation. *Id.* The District Court, however, did not grant either a change of venue or a continuance, relying on the pendency of the *voir dire* proceedings. *Id.* Analyzing the results of such *voir dire*, the First Circuit found that the defendant had failed to establish "persuasive direct evidence of the level of saturation of inflammatory publicity." *Id.*

In the late 1990's, a pair of cases arising from public corruption resulted in two opinions from this District Court that are instructive for the case at hand. In *U.S. v Kourí-Pérez*, 985 F.Supp. 25 (1997), several co-defendants filed a motion for change of venue based on adverse pretrial publicity and submitted polling data in support that purportedly showed one fifth of the Puerto Rican population had "some impression" of defendant Yamil Kourí-Pérez's guilt. 985 F.Supp. at 26. After analyzing the applicable presumption of prejudice standard under First Circuit case law (*i.e., Rodríguez-Cardona, Angiulo,* and *Maldonado-Rivera*), the District Court compared the publicity there with that presented in *Moreno Morales* and considered it as "simply *de minimis*":

> This case does not involve a circus like atmosphere. Defendants' arguments and poll do not convince us that the jurors will be prevented from making impartial judgments regarding the defendants. Pretrial publicity has not saturated the community of Puerto Rico, for a relatively small minority of the population has been demonstrated to have a bias against defendant.

*Id.* The District Court also found that "publicity will impact this case less and less over time" in contrast with *Moreno Morales*, where the trial "was continued once to prevent disruption by election-year rhetoric…." *Id.,* at 29.

The other case is *United States v. Dubón-Otero*, 76 F.Supp. 161 (1999), which arises from the same public corruption scandal as that in *Kourí-Pérez* but was held after the conclusion of the latter defendants' trial and conviction. In *Dubón-Pérez*, the defendants moved for a change of venue or, alternatively, a continuance of trial based on adverse pretrial publicity related to the *Kourí-Pérez* trial. 76 F.Supp. at 166-67. The District Court here recognized that "[u]ndeniably, this trial has generated a large amount of publicity" but cautioned that the issue was "whether the publicity in this case renders an impartial trial impossible" and found that "it does not." *Id.* at 166. In support of their request, the defendants submitted 1,432 newspaper articles and a list of 195 television reports, which the District Court found to be, "upon close[] inspection… largely factual in nature…." *Id.* at 167. This conclusion "actually subverts any presumption of pretrial prejudice." *Id.* (*citing Angiulo*, 897 F.2d at 1181). The District Court also compared the underlying facts to those of *Rideau* and found them "patently dissimilar." *Id.* Finally, specifically as to the request for continuance, the District Court compared and contrasted the facts to those of *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), where the First Circuit reversed a district court's denial of a continuance. *Id.* at 168. According to the District Court, in *Delaney*,

> a congressional subcommittee had held an investigative hearing right before the trial causing massive pre-trial publicity on a nationwide scale. Some of the evidence revealed at the hearing proved defendant's guilt and some of the damaging evidence would be inadmissible at trial. In light of these circumstances, the Circuit held that denial of a motion for a continuance was an abuse of discretion.

*Id*. That was not the case in *Dubón-Otero*, where there was no "nation-wide media extravaganza[,] any overwhelming inflammatory sentiment[, and] the majority of the publicity

surrounding [d]efendants comes from factual reports" of the *Kourí-Pérez* trial. *Id.* The *Kourí-Pérez* trial, the District Court concluded, "was not a situation where inadmissible evidence was presented or in which Defendants' guilt was assessed." *Id.*

In addition, the Court finds it worth mentioning this District's most recent decision regarding pretrial publicity in a public corruption case. In *U.S. v. Keleher*, No. 20-cr-019 (FAB), 2020 WL 4784749 (D.P.R. Aug. 17, 2020), the defendant was the former Puerto Rico Secretary of Education, who was indicted for conspiracy to commit honest services fraud, wire fraud, and federal program bribery. *Keleher*, 2020 WL 4784749 at *1. There, the District Court carefully analyzed the defendant's arguments and supporting evidence of adverse pretrial publicity, which included approximately 40 media reports. *Id.*, at n.2. The District Court, relying on *Skilling*, concluded that transfer was unwarranted because, *inter alia*, the publicity was "not kind" but fell short of containing a "confession" or a "smoking gun," it being "largely factual." *Id.*, at *12. Also, that the aspersions used in the media were "not more prejudicial than references to a 'mafia boss'" as used in *Angiulo*, "which fall significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." *Id.* (quotation marks omitted).

Finally, the only recent case where the First Circuit found a presumption of prejudice is *U.S. v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015). There, the First Circuit applied the four-factor test laid down by the Supreme Court in *Skilling v. U.S.*, 561 U.S. 358 (2010) to determine whether

a presumption of prejudice due to pretrial publicity existed. *Casellas-Toro*, 807 F.3d at 386-88.[14] It analyzed "[1] the size and characteristics of the community, [2] the nature of the publicity, [3] the time between the media attention and the trial, and [4] whether the jury's decision indicated bias." *Casellas-Toro*, 807 F.3d at 386. Finding that Puerto Rico, "[b]eing a compact, insular community… is highly susceptible to the impact of local media" (citing *Moreno Morales*, 815 F.2d at 734), the First Circuit focused on the nature of the publicity, noting, among other things, that "the media reported rumors about [the defendant's] character—that he was a drug user, threatened people with firearms, was involved in a hit-and-run vehicle accident, and bragged about assassinating the then-governor of Puerto Rico." *Casellas-Toro*, 807 F.3d at 387. In addition, it considered "most important[]" the fact that the defendant there had just been found guilty of murder in a separate—and televised—trial in the Commonwealth of Puerto Rico courts just two months prior to the start of *voir dire* in the federal trial. 807 F.3d at 388. That trial and conviction was "extensively and sensationally" covered by the media, and the Commonwealth had made allegations that related directly to the carjacking charge that the defendant faced in federal court. *Id.* Given the above,[15] the First Circuit found that it was an extreme case presenting "'[m]assive' and 'sensational' publicity blanketing the community for two years before trial; extensive reporting on the defendant's conviction by a jury, of an intertwined, heinous crime; [and] televised sentencing only two months before voir dire." *Id.*, at 388.

---

[14] *Skilling* and *Casellas-Toro* involved requests for transfer of venue but not for continuance of trial.

[15] Other factors, not relevant here, were also considered, such as the ultimate state jury verdict reinforcing the finding of prejudice and the government's decision to not oppose the request for transfer of venue.

### 4.     Pérez-Otero Fails to Establish a Presumption of Prejudice

The cases summarized above support this Court's conclusion that a finding of presumption of prejudice is unwarranted.

As in *Orlando-Figueroa*, Pérez-Otero is a former mayor of a municipality facing public corruption charges. There, despite a proffer of more than 150 articles from seven newspapers, the First Circuit found no presumption of prejudice attached, as the media reports were not particularly inflammatory, and the publicity had largely abated by the time the trial was held.

In *Misla-Aldarondo*, the First Circuit again faced a claim of adverse pretrial publicity by a former public official with, arguably, a wider public presence, being the former Speaker of the Puerto Rico House of Representatives. Even though this publicity was in part based on concurrent allegations of sexual assault, and that the defendant had presented 180 newspaper articles to support his claim, the First Circuit found that the publicity did not warrant a finding of presumption of prejudice and that the jury's *voir dire* would be enough to screen out potential prejudice.

The same conclusion was reached in the three District Court decisions examined above: *Kourí-Pérez*, *Dubón-Otero*, and the most recent, *Keleher*—all involving public corruption scandals that stretched beyond the geographic contours of just one municipality. There, the District Court was not persuaded to find a presumption of prejudice even when faced with voluminous appendixes of media reports as well as party-commissioned polling reports that showed

significant percentages of potential prejudice among the prospective jury pool or voluminous proffers of media coverage.

Additionally, the Court finds no equivalence between the alleged pretrial publicity here and the publicity described in *Casellas-Toro*, the only surveyed case where the First Circuit found presumed prejudice. Pérez-Otero's case does not involve a scandalous murder and a close-in-time televised trial and conviction. Moreover, Pérez-Otero makes no attempt (and it is unlikely he could) to compare the allegedly adverse publicity at issue here with the extensive and sensational publicity described in *Casellas-Toro*.[16]

In contrast, and in sum, Pérez-Otero has only presented an unverified (and unsigned) report prepared by a party-retained research consultant that includes a list of alleged uses of the photographs in question by social media accounts and other online media websites. The report does not describe the alleged publicity, does not attempt to reliably quantify its reach in the Puerto Rican community, and provides no context by which to evaluate the publicity's nature.

It also bears mentioning that Pérez-Otero was arrested on December 9, 2021, and trial is set to begin on March 13, 2023—a year and four months after his arrest. **ECF No. 27, 32** and **43**. According to the media report attached to Pérez-Otero's motion, most of the media coverage involving the photographs in question occurred on or closely after this date. **ECF No. 41-1**. In addition, in all of 2022, the report only lists 4 instances of the photograph's use. *Id.*, at 2 and 6. It

---

[16]Pérez-Otero has not provided any evidence by which this Court would be able to measure social media and online media reach within the Puerto Rican community. *See*, *U.S. v. Keleher*, No. 20-cr-019 (FAB), 2020 WL 4784749 at *11 (D.P.R. Aug. 17, 2020) (concluding that it was "not immediately apparent to the Court that Puerto Ricans are especially susceptible to local media.").

is only now, in January 2023, that their use has supposedly increased, although at levels far below those of December 2021. This recent supposed media coverage began on January 9 ,2023, which is the same date Pérez-Otero filed his motion to dismiss. *Id.*, at 2 and 5. It seems, from the document supplied by Pérez-Otero, that the initial publicity of his arrest and the photographs has abated significantly over the course of a year.

As is evident from this Court's survey, stronger, more robust showings of pretrial publicity in public corruption cases have been denied as falling below the threshold necessary to presume prejudice. This shows that any claims of adverse pretrial publicity in the case at bar, as presented by Pérez-Otero, are vague, not supported by evidence, and do not warrant a finding of presumption of prejudice. There is no reason for this Court to depart from this consensus to make an exception for Pérez-Otero.

Moreover, the Court cannot overlook the fact that Pérez-Otero has failed to justify bringing this matter to the Court's attention more than a year after the photographs in question were filed. He has also failed to justify his failure to move to restrict public access to the photographs at any point between then and now. Even if all of the above discussion on the lack of merit of his presumed prejudice claim were to be ignored, his lack of diligence is enough to convince this Court that the request for a continuance solely based on the public's awareness of the photographs in question is untimely.[17]

---

[17] In this vein, defendant's request for this Court to take judicial notice of Spanish language documents or news articles at **ECF No. 52** is impermissible. It is black letter law in this Circuit that "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." 48 U.S.C. § 864, L. Civ. R. 5. It also applies to any key "Spanish language document or matter." *Puerto Ricans For Puerto Rico*

The Court thus finds that Pérez-Otero has failed to establish that the use by the media of the complained-of photographs presents one of those extreme cases where "there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *See*, *Nebraska*, 427 U.S. at 553 (*quoting Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)).[18]

For the above-stated reasons, Pérez-Otero's request for a continuance and for an amendment to the protective order at **ECF No. 41**, his motion *in limine* at **ECF No. 46**, and his motion at **ECF No. 52** are **DENIED**.

### C.   Pérez-Otero's Request to Amend the Protective Order

Finally, the Court turns to Pérez-Otero's request to amend the protective order at **ECF No. 34-1**. It appears Pérez-Otero has misconstrued the scope of the Order issued in January 2023. The protective order approved by the Court clearly allows for the use of the discovery material produced thereunder in the manner requested by Pérez-Otero. That is, Pérez-Otero may make

---

*Party*, 544 F.3d at 67. Because the attached exhibit at **ECF No. 52-1** is in the Spanish language (as well as, presumably, most, if not all, of the undefined universe of "all other publications of the photographs" that defendant lazily asks this Court to take judicial notice of), defendant's request is hereby **DENIED**.

[18] Finally, it is far from apparent to the Court what the "tone and extent" of the complained-of publicity is, or who is "shaping" said publicity—despite defendant blaming the government for its perceived woes. *See*, *Nebraska*, 427 U.S. at 554-55. The Court reminds the parties that the concerns highlighted by the Supreme Court in *Nebraska* and *Sheppard* apply to <u>all</u> people participating in a trial, including defense counsel:

> Neither **prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court** should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

*Sheppard*, 384 U.S. at 363 (emphasis added). The Protective Order issued by the Court at **ECF No. 50** seeks to prophylactically assure everyone's compliance with their duty.

such materials available for review by witnesses or potential witnesses under the terms provided by the order. The Court thus fails to see what relief it can grant to Pérez-Otero.

Moreover, Pérez-Otero complains that—contrary to the government's prior assertion—it did not consent to the entry of the protective order. The government, in its response to Pérez-Otero's motion, conceded the error. **ECF No. 42**, at 1. But apart from delayed clarification discussed above, Pérez-Otero has not put forth any reason why the protective order should not have been granted nor requested any relief from the same. The request to amend the protective order is therefore **DENIED**.

IV.    **CONCLUSION**

"Charges of corruption by high public figures inherently generate considerable public attention and notice. This court has affirmed denials of motions to [ ] postpone trial due to pre-trial publicity in cases involving much more high-profile, sensational criminal activity." *Orlando-Figueroa*, 229 F.3d at 43 (*citing Angiulo*, 897 F.2d at 1180-83, and *Moreno Morales*, 815 F.2d at 729-31). Pérez-Otero's has failed to establish that the pretrial publicity surrounding his case is anywhere near the level that would compel the continuance of the trial or, for that matter, the exclusion of the complained-of photographs from said trial. For the reasons stated above, the Court finds that Pérez-Otero has not established a presumption of prejudice due to adverse pretrial publicity. For the above-stated reasons, Pérez-Otero's request for a continuance and for

an amendment to the protective order at **ECF No. 41**, his motion *in limine* at **ECF No. 46**, and his

motion at **ECF No. 52** are **DENIED**.

      **SO ORDERED**.

      At San Juan, Puerto Rico, on this 8th day of March, 2023.

                  **S/AIDA M. DELGADO-COLÓN**
                  **United States District Judge**