**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**                                                    **Crim. No. 21-474 (ADC)**

**ANGEL PEREZ-OTERO,**

    **Defendant.**

---

**OPINION AND ORDER**

**I.      Introduction**

On December 8, 2021, a grand jury returned a three-count indictment against defendant Ángel Pérez-Otero ("Pérez-Otero" or "defendant"), the former Mayor of the Municipality of Guaynabo, Puerto Rico ("Municipality"), on charges of conspiracy to commit federal program bribery (18 U.S.C. § 371), federal program bribery (18 U.S.C. § 666(a)(1)(B)), and extorsion under color of official right (18 U.S.C. § 1951). **ECF No. 3**.

Count One charged Pérez-Otero with engaging in a conspiracy with unindicted co-conspirator Oscar Santamaría ("Santamaría"), spanning from on or about late 2019 to May 2021, to commit federal program bribery by accepting cash payments from the latter in exchange for awarding his company, Island Builders, municipal contracts as opportunities arose and prompt payment thereon. **ECF No. 3** at 2-4. Count Two charged Pérez-Otero, a public official, with committing federal program bribery by accepting three $5,000 cash payments from Santamaría between May 19 and August 19, 2021, with the intent of being influenced and rewarded in

connection with municipal contracts. *Id.*, at 4-5. Lastly, Count Three charged that from late 2019 until in or about August 2021, Pérez-Otero with committing extortion under color of official right by obtaining property from Santamaría, with his consent, that was not due to him or his office as mayor of Guaynabo. *Id.*, at 5-6.[1] In plain terms, the United States of America ("government") charged Pérez-Otero with periodically receiving bribes from Santamaría in return for him providing useful information or steering municipal contracts to Santamaría's companies and taking actions to assure prompt payment thereon.

Trial began of March 13, 2023. On March 22, 2023, after the close of the government's case-in-chief, Pérez-Otero made an oral Fed. R. Civ. P. 29(a) motion which the Court denied. Later that same day, a jury found Pérez-Otero guilty on all three counts. **ECF No. 102.** Before the Court is defendant's post-verdict motion for judgment of acquittal pursuant to Fed. R. Civ. P. 29(c), filed on April 5, 2023. **ECF No. 106**. The government filed an opposition on April 28, 2023. **ECF No. 110.** Defendant, with leave of Court, filed a reply on May 18, 2023. **ECF No. 113**.

Having considered the trial transcripts ("Tr.")[2] and the evidence on record,[3] the Court **DENIES** defendant's motion at **ECF No. 106** for the reasons set forth below.

---

[1] The indictment includes a forfeiture allegation under 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C) conditioned on the conviction of Pérez-Otero under the preceding counts.

[2] Trial was held on the days of March 13, 16, 17, 20, 21, and 22. References to the trial transcripts in this Opinion & Order shall be as follows: "Tr. [month]/[day], **ECF No. [ ]** at [page : line] to [page : line]."

[3] The documentary and photographic evidence admitted as exhibits at trial can be found at ECF No. 117. References to these in this Opinion & Order shall be as follows: "**ECF No. 117-[ ]** (Gov't Exhibit [ ]) at [page]". The videos and

## II.    Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure permits a court to "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." *Id.*, R. 29(c)(1). "A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge." *Id.*, R. 29(c)(3).

In reviewing a Rule 29 motion, a court considers the evidence "in the light most favorable to the government." *United States v. Gómez-Encarnación*, 885 F.3d 52, 55 (1st Cir. 2018). "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved <u>all</u> the essential elements of the charged crime beyond a reasonable doubt." *United States v. Fernández-Jorge*, 894 F.3d 36, 42 (1st Cir. 2018) (emphasis in original) (cleaned up).

Thus, the analysis under Rule 29 "begin[s] by considering whether any rational fact-finder could have concluded beyond a reasonable doubt that" the defendant committed each element of the offense for which he was convicted. *Id.*, at 3. In doing so, the court "take[s] into account all evidence, both direct and circumstantial, and resolve[s] evidentiary conflicts and

---

audio files admitted as evidence, namely, Govt' Exhibits 27, 30-2, 32, 32-1, 35, 37, 37-1, 41, and 45, are on file with the Court.

credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d 237, 244 (1st Cir. 2012). "[A] guilty verdict may rest on reasonable factual inferences drawn from direct or circumstantial evidence, but not on insupportable or overly speculative evidentiary interpretations…. And, it is within the jury's purview to evaluate competing factual inferences and theories that are supported by the evidentiary presentation." *United States v. Ridolfi*, 768 F.3d 57, 61 (1st Cir. 2014) (citations omitted).

Ultimately, the court need only determine that the conviction "finds support in a plausible rendition of the record." *United States v. Shaw*, 670 F.3d 360, 362 (1st Cir. 2012). "Reversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." *United States v. McDonough*, 727 F.3d 143, 152 (1st Cir. 2013) (cleaned up).

### III.   Analysis

Pérez-Otero moves for a verdict of acquittal based on four grounds. First, he argues that the evidence presented to the jury was insufficient to prove the existence of an "explicit" *quid pro quo*[4] agreement under *McCormick v. United States*, 500 U.S. 257 (1991). **ECF No. 106** at 9-11. This argument hinges on Pérez-Otero's assumption that the government did not prove that the

---

[4] The phrase "quid pro quo" is a Latin phrase that stands for "something for something." *See* QUID PRO QUO, Black's Law Dictionary (11th ed. 2019) *available at* Westlaw ("An action or thing that is exchanged for another action or thing of more or less equal value; a substitute…"). In the public corruption context, it "captures the notion of a direct exchange of an official act for money." *McCutcheon v. Federal Election Com'n*, 572 U.S. 185, 192 (2014).

cash payments he received were *not* campaign contributions. Second, he argues that if the Court were to find *McCormick* inapplicable, the evidence presented at trial was still insufficient to prove the existence of a *quid pro quo* agreement because there was no illegality in the Municipality's contracting relationship with Island Builders. *Id.*, at 11-12. Third, defendant argues that the actions he took in favor of Santamaría and Island Builders do not constitute "official acts" for purposes of 18 U.S.C. § 1951 under *McDonnell v. United States*, 579 U.S. 550 (2016). *Id.*, at 12. Fourth, Pérez-Otero argues that the periodic cash payments made to him by Santamaría were after-the-fact gratuities, not bribes, under *United States v. Bravo-Fernández*, 722 F.3d 1 (2013). *Id.*, at 12-13.[5] As a result of the above, Pérez-Otero argues, he should be acquitted on all counts.[6]

The Court will analyze each argument in turn under Fed. R. Crim. P. 29's standard, taking into account the record as well as the government's position.

**A. The statutes at issue: Federal Program Bribery (28 U.S.C. § 666(a)(1)(B)) and Extortion Under Color of Official Right (28 U.S.C. § 1951).**

---

[5] This theory was never argued or advanced either at the pre-trial or trial stage of the case.

[6] Pérez-Otero's motion for acquittal does not directly challenge any substantive element of his conviction for conspiracy to commit federal program bribery in Count One, except to the extent that they overlap with Counts Two and Three. Therefore, the Court considers it unnecessary to evaluate Count One independently, as it will rise or fall with its analysis on Counts Two and Three.

The starting point for the Court's analysis is the statutes themselves, as they provide the necessary context in which to analyze the sufficiency of the evidence. Beginning with the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B), this statute provides in relevant part that:

> Whoever, if the circumstance described in subsection (b) of this section[7] exists[,] being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof… corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more… shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(1)(B). The statute includes, among other elements, a so-called "transactional element"—that the defendant's receipt of the bribe be "in connection with any business, transaction, or series of transactions of such… government… involving any thing of value of $5,000 or more…." *See United States v. Bravo-Fernández*, 722 F.3d 1, 12 (1st Cir. 2013).

On the other hand, the Hobbs Act, 18 U.S.C. § 1951, provides that:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
> (b) As used in this section… (2) The term "extortion" means the obtaining of property from another, with his consent… under color of official right.

---

[7] "The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b).

18 U.S.C. § 1951. To prove a Hobbs Act violation in the form of extortion under color of official right, the government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Ocasio v. United States*, 578 U.S. 282, 285 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 260 (1992)); *see also United States v. Correia*, 55 F.4th 12, 29 (1st Cir. 2022) (same). Neither duress nor coercion are elements of extortion under color of official right. *United States v. Buffis*, 867 F.3d 230, 235 (1st Cir. 2017).

Both statutes evidently reach similar conduct. To wit, extortion under color of official right has been described as the "rough equivalent of… taking a bribe." *Correia*, 55 F.4th at 29 (quoting *Ocasio*, 578 U.S. at 285 and *Evans*, 504 U.S. at 260). However, whereas an "official act" is an element of 18 U.S.C. § 1951, the First Circuit has never explicitly held that it is an element of 18 U.S.C. § 666(a)(1)(B):

> [A]lthough our Circuit has proceeded in some cases on the understanding that § 666 does contain an "official act" element, we have done so only in cases in which the government did not dispute the point and in which the jury had been instructed that the offense does contain an 'official act' element…. We thus have not held that § 666 does have an "official act" element.

*United States v. Carrasco*, 79 F.4th 153, 161 (1st Cir. 2023). Particularly (and as relevant to Pérez-Otero's third ground for acquittal—more on that below), the government here disputes that an official act requirement is part of 18 U.S.C. § 666(a)(1)(B) and cites decisions from the Second, Sixth, Eighth, and Eleventh Circuits in support. *See* **ECF No. 110** at 17.

Regardless, in *McDonnell v. United States*, 579 U.S. 550 (2016), the Supreme Court provided a definition for "official act" as used in the general federal official bribery statute, 18 U.S.C. § 201(a)(3).[8] It said that "an official act is a decision or action on a question, matter, cause, suit, proceeding or controversy." *McDonnell*, 579 U.S. at 574 (quotation marks omitted). It further specified that "[t]he question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* "It must also be something specific and focused that is pending or may by law be brought before a public official." *Id.* For purposes of § 201(a)(3),

> the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.

*Id.*

With this background, the Court proceeds to analyze Pérez-Otero's first ground for acquittal.

### B.    The "explicitness" requirement: whether *McCormick* applies.

Pérez-Otero's first argument relates to the "explicitness" requirement laid down in *McCormick v. United States*, 500 U.S. 257 (1991), applicable to bribes paid in the form of campaign

---

[8] Legislatively, § 666 grew out of § 201 and was designed to cover State and local government officials, which § 201 arguably did not cover. *See generally Bravo-Fernández*, 722 F.3d at 20-22 (background on the adoption of § 666).

contributions.[9] Essentially, *McCormick* requires that the government establish the existence of an "explicit" *quid pro quo* agreement when (and only when) the thing of value exchanged is a campaign contribution. *See United States v. McDonough*, 727 F.3d 143, 155 n. 4 (1st Cir. 2013) ("[W]e have held that *McCormick* applies only in the context of campaign contributions."); *accord United States v. Turner*, 684 F.3d 244, 253-54 (1st Cir. 2012). Therefore, for *McCormick* to be applicable here, the cash payments that Pérez-Otero accepted from Santamaría—i.e., the thing of value or property under 18 U.S.C. §§ 666(b)(1) and 1951—needed to have been campaign contributions.

Pérez-Otero's argument is a two-step sufficiency challenge. Pérez-Otero argues that the burden was on the government to prove the negative—that Santamaria's cash payments to him

---

[9] While it is beyond dispute that *McCormick's* explicitness requirement may apply to extortion under color of official right pursuant to 18 U.S.C. § 1951, it is not as clear whether it may also apply to the federal program bribery statute, 18 U.S.C. § 666. Pérez-Otero does not develop an argument to that effect beyond stating as much in a section titled "Rule 29 standard":

> To convict Perez-Otero of federal program bribery and extortion, the prosecution had to prove beyond a reasonable doubt that the payments received by him were political campaign contributions that resulted from an explicit quid pro quo (QPQ) or that, if the payments were not considered political contributions, then the prosecution did not have to prove an explicit QPQ.

**ECF No. 106** at 2. In any case, the government does not argue to the contrary (*see* **ECF No. 110** at 16) and the jury was instructed about the explicitness requirement as to both Counts Two and Three. *See* **ECF No. 101** at 20, 23-24. In addition, other courts have considered it applicable to prosecutions for federal program bribery under 18 U.S.C. §§ 666(a)(1)(B). *See, e.g., United States v. Siegelman*, 640 F.3d 1159, 1170 (11th Cir. 2011) (applying *McCormick's* explicit promise requirement to 18 U.S.C. §§ 666(a)(1)(B)); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act."). Regardless, the inclusion of an "explicitness" instruction in Count Two operated in favor of defendant as it required an arguably higher standard for the jury to convict, so there would be no harm from its inclusion.

were *not* political campaign contributions. If so, Pérez-Otero contends, the government would have needed to meet *McCormick's* explicitness requirement and establish the existence of an explicit *quid pro quo* agreement consisting of campaign contributions for municipal contracts and prompt payment of such, which Pérez-Otero argues it failed to do.

In its opposition, the government pushes back on the underlying assumption that the cash payments were campaign contributions, something it sought to refute at trial by presenting evidence that the $70,000 campaign debt did not even exist. The government also pointed to evidence presented at trial establishing that the cash payments were never reported by Pérez-Otero or his campaign as political campaign contributions or otherwise. **ECF No. 110** at 16. Moreover, the government counters by arguing that even if *McCormick*'s explicitness requirement were applicable, the evidence was nonetheless sufficient for a reasonable jury to find that an explicit *quid pro quo* agreement existed between Santamaría and Pérez-Otero. *Id.* The government also points to the jury having been properly instructed on the application of the explicitness requirement, which they were told to apply if they considered that some of the payments were campaign contributions. *Id.*, at 3, 16-17.

The Court notes that Pérez-Otero's contention that these payments were meant as political campaign contributions goes back to before trial began. Pérez-Otero attempted to obtain the dismissal of the indictment based on this same theory. At the time, he argued that the government's discovery materials showed that these payments were campaign contributions

and that the indictment failed to state an offense as a result because it lacked allegations of an explicit *quid pro quo* under *McCormick*. *See* **ECF No. 30**. The Court denied the motion because "the indictment does not allege bribery or extorsion in the form of campaign contributions." **ECF No. 65** at 11. The Court cautioned Pérez-Otero that "[w]hether the government's evidence will be enough for a jury to convict him of the charges in the indictment is a matter for the jury to decide." *Id.*[10]

At trial, Pérez-Otero chose not to present any evidence to support his theory, relying instead on the perceived weakness of the government's evidence. The only indication that the cash payments were meant as political contributions came from Santamaría's own testimony that Pérez-Otero told him of a $70,000 campaign debt carried over from his 2017 special election campaign for mayor.[11] On the other hand, the government presented documentary and testimonial evidence from which a reasonable jury could conclude that a significant portion or

---

[10] This conclusion, furthermore, accords with language in *McCormick*: "We agree… that in a case like this it is proper to inquire whether payments made to an elected official are in fact campaign contributions, and we agree that the intention of the parties is a relevant consideration in pursuing this inquiry." 500 U.S. at 271. *See also id.,* at 270 ("It goes without saying that matters of intent are for the jury to consider.") (citing *Cheek v. United States*, 498 U.S. 192, 203 (1991)).

[11] Although one could say that the testimony of FBI Special Agent Miguel Rodríguez also supports this theory:

> Q. Did at any time Mr. Santamaria tell you that the $5,000 that he was paying to Mr. Pérez were to pay off a campaign debt?
> A. A portion of them, yes.

Tr. 3/17, **ECF No. 86** at 167:25 to 168:1-3. Nevertheless, this hearsay statement merely confirms Santamaria's testimony that he believed he was paying off the $70,000 campaign debt but kept on with the cash payments after he had paid its totality.

totality of the cash payments were not political contributions and that the alleged $70,000 campaign debt never even existed.

Without deciding who bears the burden of proof on this issue and because it need only "find support in a plausible rendition of the record," *Shaw*, 670 F.3d at 360, the Court will test the government's evidence against Pérez-Otero's first assumption: that the government failed to prove that the cash payments were *not* political campaign contributions. If a reasonable jury could find that the cash payments were not political campaign contributions, then *McCormick* does not apply, and the government did not need to show that the *quid pro quo* agreement was explicit.

### 1. The cash payments: how, when, and where.

Santamaría testified before the jury that he began making cash payments to Pérez-Otero "at the end of 2018, beginning of 2019." Tr. 3/20, **ECF No. 90** at 88:23 to 89:2.[12] He also testified that prior to this, he had a meeting with Pérez-Otero where the latter "was a little bit upset" with him because he had previously supported Pérez-Otero's political opponent in the 2017 special election for mayor of Guaynabo, which Pérez-Otero ultimately won. *Id.*, at 93:15-24. Santamaría testified that he asked Pérez-Otero "how I could help him, if there was any debt of

---

[12] In what appears to have been a tactical decision, the government charged Pérez-Otero for conduct beginning on or about late 2019 even though Santamaría stated that the payments began prior to that.

the campaign," to which Pérez-Otero replied that there was a "$70,000 debt…." *Id.*, at 94:1-3.

Santamaría then testified that he said to Pérez-Otero:

> … that I could help him [by] paying the debt[,] that I will make monthly payments
> in order to pay the debts. So I divide in my mind 70,000 in five, so it would be like
> 14 payments. So I told him that we would meet every month or every four or five
> weeks to give him the money in order to pay the debt.

*Id.*, at 94:3-8. He began making the payments one month after his meeting with Pérez-Otero,

which were usually made in restaurants or cafeterias. *Id.*, at 53:6-10, 88:23 to 89:2. He always

made these payments in secret. *Id.*, at 61:19 to 62:5; 98:10 to 99-3. One such meeting took place

in a parking lot outside a convention center in Cataño where a meeting of the mayors' federation,

of which Pérez-Otero was president, was being held.

Notably, at this point it is worth pointing out that Santamaría testified extensively as to

his involvement in bribery schemes with other mayors of other municipalities in Puerto Rico.

*See generally* Tr. 3/20, **ECF No. 90** at 21-48. One of these was the former Mayor of Cataño, Felix

Daniel Delgado-Montalvo, a.k.a. "Cano," who testified at trial as a witness for the government

and detailed the bribery scheme he and Santamaría engaged in his municipality. *See generally*

Tr. 3/17, **ECF No. 86** at 93-98. This scheme essentially boiled down to cash payments for

municipal contracts, and Delgado-Montalvo detailed how he, as mayor, could exert control over

the nominally independent municipal bidding board to direct contracts to Santamaría.

Going back to the mayors' federation meeting: according to both Santamaría and

Delgado-Montalvo, Santamaría called Delgado-Montalvo to his car, gave him a pre-accorded

cash bribe, and then asked him to procure Pérez-Otero, who was inside the convention center, and have him come to his vehicle. Tr. 3/20, **ECF No. 90** at 99:4-21; Tr. 3/17, **ECF No. 86** at 84:4 to 85:4. Pérez-Otero complied (somewhat begrudgingly according to Santamaría and Delgado-Montalvo), and Santamaría then also gave him an envelope with a cash payment in the car. Tr. 3/20, **ECF No. 90** at 89:22 to 100:5; Tr. 3/17, **ECF No. 86** at 85:12-16.

Santamaría went on to testify that these meetings and secret cash payments continued even after he had paid the alleged $70,000 campaign debt, and that he continued to make the usual $5,000 payments because he feared Pérez-Otero's reaction if he stopped. Tr. 3/20, **ECF No. 90** at 96:15 to 97:4. As per Santamaría, he repaid the alleged campaign debt "at some point" but continued to make the $5,000 payments because, in his words:

> I wanted to keep the relation alive. I didn't want to – we were having meetings every four to five weeks, sometimes six weeks. If I stop making the payment it would – I did not know at that moment how he would act. So I was getting contracts, I was getting jobs, and I didn't want him to think that I was not helping.

*See* Tr. 3/20, **ECF No. 90** at 96-98. The cash payments continued through May 19, 2021, when Santamaría, now cooperating with the government, met with Pérez-Otero in a coffee shop and handed over an envelope containing $5,000 in cash while under video and audio surveillance.[13] *See id.*, at 51:8 to 64:12; **ECF No. 117-25** (Gov't Exhibits 24 (audio transcript)); and Gov't Exhibit 27 (video recording). Santamaría met with Pérez-Otero two more times under video and audio

---

[13] Santamaría testified that he was first approached by the FBI on May 3, 2021. Tr. 3/20, **ECF No. 90** at 49:2-4.

surveillance, on July 1 and August 19, 2021, and gave him $5,000 in cash in a white envelope on

each occasion.[14]

### 2.  Evidence that the cash payments were *not* political campaign contributions.

The government presented several witnesses and documents to refute the notion that the

cash payments were political campaign contributions. The government brought Sarah

Rodríguez, Chief of Staff and legal counsel at the Commonwealth of Puerto Rico's Office of the

Electoral Comptroller, to testify as to political campaign reporting procedures and

requirements, which her office oversees. Ms. Rodríguez testified that candidates for all political

positions, including candidates for mayor, participate in a training session provided by her

office to learn "what can be done and what cannot be done" in their political campaigns. *See* Tr.

3/20, **ECF No. 90** at 178:14 to 179:23. Ms. Rodríguez personally gave a training session titled

"Financing of Political Campaigns Legal Regulations, Financial Structure and Internal Controls"

that was attended by Pérez-Otero on October 29, 2019. *Id.*, at 180:11 to 182:15; *see also* **ECF No.**

**177** (Gov't Exhibits 56 and 56-1). There, she instructed the candidates present that if they

received cash as a campaign contribution, they needed to "deposit it in the bank account related

to the campaign committee and then to inform it in the income and expense report." Tr. 3/20,

**ECF No. 90** at 182:16-23. Ms. Rodríguez further instructed the candidates that they could not

receive a cash contribution and simply "turn around and pay" a campaign expense "with the

---

[14] The money for the three cash payments was provided by the government. Tr. 3/20, **ECF No. 90** at 114:20-22.

same cash," the clear implication being that the cash needed to be deposited in the campaign's bank account first. *Id.*, at 183:9-17; *see also id.*, at 186:4-17 (explaining that campaign expenditures must be paid by check, wire transfer, debit cards, or if under $250, from petty cash withdrawn directly from the bank account).

The government, through Ms. Rodríguez, also presented as evidence several bank statements for Pérez-Otero's campaign's bank account dated from May to December 2017, which is the relevant period for his 2017 mayoral campaign from which the alleged $70,000 debt came from. *See* **ECF No. 117-37** (Gov't Exhibit 48). Ms. Rodríguez testified that Pérez-Otero's campaign only had one such account—again, the clear implication being that all campaign contributions received and campaign expenses paid would flow in and out of the account reflected in the bank statements. Tr. 3/20, **ECF No. 90** at 188:11-17. As of December 31, 2017, the account had a positive balance of $62,845.22. *Id.*, at 187:18-21. However, on cross, Ms. Rodríguez admitted that campaign debts would not be reflected in the campaign account's bank statements but in another type of financial report that is filed with her office. *Id.*, at 188:22 to 189:6.

On that specific matter, the government presented another witness from the Electoral Comptroller's office, senior auditor Mr. Abraham Javier David-Espada. Mr. David-Espada testified that he was the auditor responsible for auditing political campaigns in Guaynabo. *See* Tr. 3/21, **ECF No. 95** at 21:16 to 22:17. He testified that by law, "the candidates and municipal committees [have] to file a report every three months with all of the income and expenses that

they incurred during that… quarter." *Id.*, at 22:20-24. The government next presented Mr. David-Espada with copies of Pérez-Otero's campaign committee's quarterly revenue and expense reports dating from March 2019 through to December 2021. *See id.*, at 23:13 to 32:34; *see also* **ECF No. 117-40** through **117-63** (Gov't Exhibits 62 through 73-1). Mr. David-Espada testified that he did not find any donation in Santamaría's name in the reports filed for the years 2019, 2020, and 2021.[15] *See* Tr. 3/21, **ECF No. 95** at 28:16 to 29:7. He also testified, in response to pointed questions from the government, that in the reports covering 2019—the year in which Santamaría testified he began paying the alleged $70,000 campaign debt—the campaign only reported a $6,223.41 debt during the period of July through September of 2019. *Id.*, at 30:20 to 32:5; *see also* **ECF Nos. 117-40** through **117-43** (Gov't Exhibits 62 through 63-1). All of the 2019 reports, moreover, were certified using Pérez-Otero's login credentials. Tr. 3/21, **ECF No. 95** at 32:6-13.

---

[15] The force of this statement is somewhat diminished because donations may have been made in other people's names. Santamaría himself testified that he gave political donations to Pérez-Otero's 2020 re-election campaign in other people's names to keep his involvement secret, so that his absence from the reports does not necessarily prove that his cash payments did not end up in the campaign's coffers. Tr. 3/20, **ECF No. 90** at 100:6 to 101:10. In addition, Ms. Rodríguez testified that it is difficult for her office to know whether a candidate received $5,000 as a campaign contribution from one person if the campaign itself does not report it. *Id.*, at 183:18-25. Moreover, Mr. David-Espada testified that during his audit, he detected several irregularities in Perez-Otero's campaign, including "revenue that was not deposited in the bank account" and "donors that were not identified pursuant to law…." Tr. 3/21, **ECF No 95** at 34:10-20. He further testified that when auditing cash donations over $250, his office sends donation confirmations to only a sample of the named donors, not the entire universe of donors. *Id.*, at 37:3 to 38:8. But in the end, this all amounts to speculation that Santamaría's cash payments could have been disguised as political contributions in the name of other donors. No evidence was presented to support this hypothesis. And ultimately, Santamaría testified at trial that when he made political campaign contributions to Pérez-Otero, he gave them directly to Agustín García, Pérez-Otero's campaign director; when he wanted to give Pérez-Otero a bribe payment, he would give it to him personally. *See* Tr. 3/20, **ECF No. 90** at 98:10 to 99:3; 100:6 to 101:10.

Finally, Santamaría gave the jury a second compelling reason to differentiate between the cash payments and campaign contributions. As mentioned before, Santamaría testified that he met Pérez-Otero in secret every four, five or six weeks to give him the cash payments directly. *See* Tr. 3/20, **ECF No. 90** at 94:6-8; 96:24-25; 98:10-24. When asked whether he made any contribution to Pérez-Otero's 2020 re-election campaign, Santamaría testified that he did: he gave two $20,000 payments to Pérez-Otero's campaign director, Agustín García, and arranged for the donations to be attributed to other people. *Id.*, at 100:6 to 101:10. This testimony sufficiently distinguishes the method by which Santamaría gave Pérez-Otero his secret cash payments (for which Pérez-Otero was charged) and that by which he "contributed" to Pérez-Otero's political campaign (for which Pérez-Otero was not charged), suggesting a difference in purpose between those two actions.[16]

As to where this money actually went, that question went unanswered at trial. The government did present evidence that Pérez-Otero never reported the cash payments in his ethical disclosures or as income in his tax returns or disclose the existence of any debt or the forgiveness of such in excess of $250. Through the testimony of Héctor Ramón Bladuell-Viera, a financial auditor from the Commonwealth of Puerto Rico's Government Ethics Office, the government presented the financial disclosure forms submitted by Pérez-Otero to his office for

---

[16] The Court expresses no opinion as to the legality of Santamaría's "contributions" to the Pérez-Otero 2020 re-election campaign under Puerto Rico campaign finance laws.

the years 2019, 2020, and 2021. **ECF No. 177-65, 117-67,** and **117-73** (Gov't Exhibits 77-1, 78-1, and 83-1). There, Pérez-Otero certified that he had not been given preferential treatment for any debt, that he had not been given any gift over $250 for the reporting periods, and that he had not received any government reimbursement over that amount. *See* Tr. 3/17, **ECF No. 86** at 177:4 to 182:15. The government also presented Pérez-Otero's income tax returns for the years 2019, 2020 and 2021—and nothing in them reflected the receipt of any income aside from his mayoral salary. *See* **ECF No. 117-77, 117-79,** and **117-81** (Gov't Exhibits 85-1, 86-1, and 87-1); *see also* Tr. 3/21, **ECF No. 95** at 40-47 (testimony of Ms. Leisa Alejandro-Castro of the Puerto Rico Treasury Department). This all works as further evidence that the debt, if it even existed, was not one that Pérez-Otero owed. Thus, neither Pérez-Otero or his campaign ever reported or disclosed the existence of a $70,000 debt.

Santamaría may have genuinely thought that he was helping Pérez-Otero pay a $70,000 campaign debt, but the evidence points to there being no campaign debt. There is no evidence that Pérez-Otero ever delivered the cash payments he received from Santamaría to his campaign committee, as required by law. Neither is there any evidence that he used those funds for campaign expenses. And importantly, Santamaría himself testified that he finished paying the

supposed campaign debt but kept making the secret cash payments, meaning that he did not intend those "post-debt" payments to be campaign contributions.[17]

Through the documents and testimonies summarized above, the government presented sufficient evidence to the jury to establish that the cash payments made in secret by Santamaría to Pérez-Otero were not political campaign contributions. For that reason, even if the evidentiary burden was on the government to begin with, the Court finds that it was sufficiently met.[18]

**C.    The *quid pro quo*: whether the evidence supports the existence of an agreement.**

Having established that a reasonable jury could have found that the cash payments were not political campaign contributions, the Court proceeds to analyze the evidence that purported to show the existence of a *quid pro quo* agreement between Santamaría and Pérez-Otero in the

---

[17] Pérez-Otero argues that Santamaría did not finish paying the $70,000 before making the three cash payments under FBI surveillance. **ECF No. 113** at 8. However, this conclusion relies on a self-serving interpretation of Santamaría's testimony, as well as an alleged and unsupported fact never presented to the jury. First, Pérez-Otero claims that the payments began in late 2019—but Santamaría repeatedly stated that he began paying him in late 2018 or early 2019. Tr. 3/20, **ECF No. 90** at 12:13-19; 88:23 to 89:2. Moreover, even though he argues that the government's timeline was elicited through "a mistaken leading question," Pérez-Otero waived such objection by not raising it at trial. Second, Pérez-Otero's timeline assumes that Santamaría met and paid him every six weeks based on one statement from Santamaría that he was meeting Pérez-Otero "every five, six weeks." *Id.*, at 54:17-18. But Santamaría also repeatedly testified that the meetings occurred every four or five weeks (*id.*, at 94:6-8). An interpretation more favorable to the verdict is that of a payment every four weeks, or even every five weeks, which would comport with Santamaría's testimony about having paid the debt prior to his government-controlled May 19, 2021 payment. Third, Pérez-Otero makes a passing reference to COVID-19 restrictions, suggesting that some of the meetings could not have taken place during regular intervals. **ECF No. 113** at 8. However, that remains an unsupported theory since no mention was ever made during trial about COVID-19 restrictions interrupting the cash payment meetings.

[18] The Court expresses no opinion on the relevance of Puerto Rico campaign finance laws to the determination of whether a cash payment is a political campaign contribution. No party purported to rely on any such laws in their briefings or at trial, and *McCormick* itself suggests that this is a question of intent. *McCormick*, 500 U.S. at 271.

form of cash payments for municipal contracts, as opportunities arose, and for prompt payment thereon. Accordingly, this agreement need not have been explicit.

Santamaría and Pérez-Otero first discussed the possibility of awarding municipal contracts to Santamaría's companies five or six months after the meeting in which they agreed that Santamaría would pay the purported $70,000 campaign debt. Tr. 3/20, **ECF No. 90** at 94:9-20. By that time, Santamaría had already begun making the cash payments to Pérez-Otero. *Id.*, at 88:2 to 89:2. In particular, Santamaría wanted a lucrative waste transfer station contract for his company "Waste Collection." *Id.*, at 94:9-20. At that time, Pérez-Otero told him that the contract was not available but offered that he had green area maintenance or gardening contracts available. *Id.*, at 94:9 to 95:2; 157:2-6. Santamaría rejected the offer but mentioned that he had a construction company named "Island Builders." *Id.*, at 95:18-20; 157:8-10. Sometime later, at a subsequent meeting, Pérez-Otero mentioned to Santamaría that certain municipal construction projects would be coming up. *Id.*, at 157:13 to 159:9. On February 12, 2020, Santamaría sent a text message to Pérez-Otero with the contact information of Island Builder's president, Carlos De Jesús-Pagán ("De Jesús"). *Id.*, at 98:4-9; **ECF No.117-75** (Gov't Ex. 84-1.). Importantly, this text message was sent barely a week after a municipal resolution, dated February 3, 2020, authorized Pérez-Otero or his designee to proceed administratively to award the contract for the Río Ward project—administratively meaning through a process of bid or

proposal by invitation under the control and purview of the Municipality of Guaynabo. *See* **ECF No. 117-2** (Gov't Exhibit 1-1) at 1.[19]

According to De Jesús' own testimony, he was told by Santamaría to expect a call from the Municipality. *See* Tr. 3/16, **ECF No. 85** at 101:15-20; 104:22 to 105:13. When he received the call, he was invited to meet with employees of the Department of Public Works and was instructed as to how to submit a proposal for road improvement projects in two *barrios* or wards of Guaynabo, the Río Ward and the Los Frailes Ward. *Id.*, at 101:9 to 104:21. After submitting the proposal, on another date, he was called in again to the Department of Public Works and was informed that Island Builders had submitted the lowest priced proposal. *Id.*, at 108:7-13. In March 2020, Island Builders was subsequently awarded the Río Ward contract, contract no. 2020-000753, which was signed on June 10, 2020. *Id.*, at 108:14 to 110:17; **ECF No. 117-2** (Gov't Ex. 1-1). That is four months after Santamaría sent De Jesus' contact information to Pérez-Otero and well after Pérez-Otero began receiving Santamaría's secret cash payments, according to the latter's testimony.

The Río Ward contract was amended three times between June 2020 and October 2021 to increase its total value and scope of work. *See* Tr. 3/16, **ECF No. 85** at 57:2 to 65:9; **ECF No. 117-**

---

[19] The Court is aware that formal bids and requests for proposals refer to different processes in government procurement and that both differ in procedural and substantive requirements. However, because it is not entirely clear from the record whether the contracts awarded to Island Builders and the contract opportunities discussed between Pérez-Otero and Santamaría referred to formal bids or requests for proposals, the Court will use the term "proposal" for the sake of uniformity.

**4, 117-6** and **117-8** (Gov't Exhibits 2-1, 4-1, and 5-1).[20] All throughout this period, Pérez-Otero was meeting with Santamaría in secret to receive $5,000 cash payments every four, five or six weeks. In the three meetings that took place between May and August of 2021, (under government surveillance) they discussed future municipal contracts for Santamaría's companies, particularly, the timing of the announcement of requests for proposals and his companies' potential involvement. *See* Tr. 3/20, **ECF No. 90** at 56:10 to 57:18, 58:4 to 60:7; 63:6-14 (May 19, 2021 meeting); 66:6-21 (July 1, 2021 meeting); 72:20 to 73:12 (August 19, 2021 meeting).

For example, they discussed awarding Island Builders additional road improvement work. In the May 19, 2021 meeting, Pérez-Otero volunteered that the Municipality would soon invite proposals for works in three wards and that Island Builders would be invited to participate. *See* Tr. 3/20, **ECF No. 90** at 56:10-22; **ECF No. 117-25** (Gov't Exhibit 24) at 4-5. In the July 1 meeting, Pérez-Otero alerted Santamaría to the fact that the request for proposals would be issued that month. **ECF No. 117-26** (Gov't Exhibit 28-3) at 5. And in the August 19 meeting, Pérez-Otero told Santamaría that he could have one of the three ward contracts. Tr. 3/20, **ECF No. 90** at 72:21 to 73:12; **ECF No. 117-28** (Gov't Exhibit 34) at 7-8. Additionally, in a recorded telephone conversation dated August 27, 2021, Pérez-Otero, on his own initiative, called

---

[20] The original contract stipulated that Island Builders was to be compensated $871,751.60 for its services under the original contract. *See* **ECF No. 117-2** (Gov't Exhibit 1-1) at 3. The three amendments were drafted and duly signed by De-Jesús and Municipality's Vice-Mayor, each time increasing the amount of compensation to Island Builders. **ECF No. 117-4, 117-6** and **117-8** (Gov't Exhibits 2-1, 4-1, and 5-1). By the third amendment, the value of this compensation had increased to $2,396,751.60. *See* **ECF No. 117-8** (Gov't Exhibit 5-1) at 2. This is a total increase of $1,252,000.00.

Santamaría to remind him to send De Jesús to participate in the pre-proposal meeting for the three ward contracts that had been issued. *See* Tr. 3/20, **ECF No. 90** at 87:24 to 88:12; **ECF No. 117-36** (Gov't Exhibit 44). Pérez-Otero warned Santamaría that if no one attended, he would be left out. *Id.*[21]

In another example of such discussions, during the May 19 meeting, Santamaría once again asked Pérez-Otero about the timing of the waste transfer station contract for his other company, Waste Collection. In response, Pérez-Otero disclosed that the announcement was supposed to come out during the summer. Tr. 3/20, **ECF No. 90** at 58:5-24; **ECF No. 117-25** (Gov't Exhibit 24) at 8. After some conversation, Santamaría insisted on his interest in competing for the contract, saying that "the sooner [it comes out] the better." **ECF No. 117-25** (Gov't Exhibit 24) at 19. Pérez-Otero told Santamaría that he would let him know "immediately" and that he would "be on the lookout" to tell Santamaría. *Id.*, at 19, 25. Twelve days later, Pérez-Otero had

---

[21] The record is not altogether clear on whether this new contract opportunity ultimately referred to the October 14, 2021 amendment to Island Builder's Río Ward contract. *See* **ECF No. 117-8** (Gov't Exhibit 5-1). In the July 1 meeting, Santamaría asked Pérez-Otero about including more funding for additional works under the contract, to which Pérez-Otero replied with a reference to the announcement of upcoming proposals. *See* **ECF No. 117-26** (Gov't Exhibit 28-3) at 25, 28. Interpreting the facts in a light most favorable to the verdict, this would mean that Santamaría asked for additional funds, Pérez-Otero assured him that an opportunity for that would arise, and then made sure to tell him to send a representative to a meeting to compete for the contract, with the end result being that an additional $500,000 was added to Island Builder's contract. *See* **ECF No. 117-8** (Gov't Exhibit 5-1) at 2. Notably, all three amendments to the Río Ward contract were initiated by requests for additional funding from Wilfredo Martínez-Vazquez, Director the Public Works Department. *See* **ECF No. 117-4** (Gov't Exhibit 2-1) at 2; **117-6** (Gov't Exhibit 4-1) at 2; and **117-8** (Gov't Exhibit 5-1) at 2. As detailed further below, Mr. Martínez-Vazquez was a close friend of Pérez-Otero, was appointed by him to his position, did not have prior experience working in the Municipality, and was also member of the Municipality's bid board. *See infra*, section III.D.1. Having a trusted designee on the bid board or as Director of the Public Works Department, as described in detail by Delgado-Montalvo, was the mechanism through which the mayor could keep control over the process and the companies to which contracts were awarded in his municipality. *See* Tr. 3/17, **ECF No. 86** at 93:16 to 98:14.

a brief telephone conversation with Santamaría in which he only asks him to confirm the name of his company, Waste Collection. Tr. 3/20, **ECF No. 90** at 65:2-15; **ECF No. 117-34** (Gov't Exhibit 40) at 2.

Also in that same May 19 meeting, Pérez-Otero disclosed to Santamaría concerns relayed to him in the Municipality about Island Builder's capacity to perform its contractual duties. Specifically, that Island Builders had to request assistance from another company due to lack of equipment. **ECF No. 117-25** (Gov't Exhibit 24) at 19-20. Pérez-Otero mentioned that this was likely an attempt by a competitor to undermine Santamaría's standing in the competition for the waste transfer station contract. *Id.*, at 20-22. Santamaría duly explained away the issue to Pérez-Otero, assuring him that he had only needed to temporarily rent equipment due to a malfunction in his stock. *Id.*, at 20-21. In doing so (minutes after handing Pérez-Otero an envelope with $5,000), Santamaría had the ear of highest public official in the Municipality and was able to plead his case directly and informally to him.

In addition, the evidence at trial clearly established that in at least two specific instances, Pérez-Otero agreed to take action to solve problems that Santamaría had raised directly with him. In one of these, Santamaría elevated a serious concern De Jesús informed him about regarding the Municipality's intent of eliminating the asphalt component from Island Builder's Río Ward contract, which would represent a significant hit to the company's profits. Tr. 3/20, **ECF No. 90** at 101:12 to 102:21. Santamaría called Pérez-Otero "immediately." *Id.*, at 102:22-25.

That day, Pérez-Otero was attending a funeral in a cemetery. *Id.*, at 102:25 to 103:1. In a scene that can be best described as taken out of Francis Ford Coppola's *The Godfather*, Santamaría went to the cemetery to meet with Pérez-Otero, who told him he was going to "attend [him] before the funeral." *Id.*, at 103:1-3. Santamaría apologized for showing up, aware that Pérez-Otero "was working and it was not a proper place to speak about contracts," but he was nonetheless "very concerned" about the information relayed to him by De Jesús. *Id.,* at 103:3-10. To his dismay, he received confirmation about the cut from Pérez-Otero himself: "And [Pérez-Otero] said to me that it was true… he wanted to cut that piece of the contract in order to—to make a bid or something." *Id.,* at 103:11-14. After Santamaría made his case, however, Pérez-Otero told him that "he would manage the thing" and take care of it. *Id.*, at 103:23 to 104:3.

De Jesús recalled in his testimony that after he called Santamaría to alert him of the problem, he scheduled a meeting with the Municipality to argue Island Builder's case for maintaining the asphalt in the contract. Tr. 3/16, **ECF No. 85** at 122:13 to 123:23. Nonetheless, when he arrived at the Department of Public Works for his scheduled meeting with the engineers and before he had the chance to argue his position, he was told that the asphalt line item "was going to be left in… that it was not going to be eliminated as they had originally indicated." *Id.*, at 124:1-4. At trial, Santamaría confirmed that the asphalt component was never taken out of Island Builder's contract. Tr. 3/20, **ECF No. 90** at 104:4-6.

On another occasion, when the Municipality had delayed an approximately $440,000 payment to Island Builders, Santamaría asked Pérez-Otero for his help. He made that request during the August 19 meeting, which was recorded by the government. *See* Gov't Exhibit 37-1. The video presented to the jury showed Santamaría meeting with Pérez-Otero in his car,[22] handing him a white envelope with $5,000 in cash shortly after explaining the issue of the outstanding invoice. Tr. 3/20, **ECF No. 90** at 81:2-23; Gov't Exhibit 37-1. According to Santamaría, Pérez-Otero quickly concealed the cash in his sock. Tr. 3/20, **ECF No. 90** at 82:1-3.[23] Soon thereafter, Santamaría dropped Pérez-Otero off at his office in City Hall, signing off with a request: "If you give me a push with the invoice, I will… [unintelligible], man." **ECF No. 117-30** (Gov't Exhibit 36) at 8.

Later that day, Santamaría texts Pérez-Otero "Can you please verify the matter of the finances please" to which Pérez-Otero replied "Ok." *See* Tr. 3/20, **ECF No. 90** at 85:8 to 86:2; **ECF No. 117-32** (Gov't Exhibit 38-1). Santamaría then called Pérez-Otero, apparently to continue a previous unrecorded telephone conversation initiated by Pérez-Otero regarding the status of the payment. In this recorded conversation, Pérez-Otero told Santamaría that the payment would be released as early as the next day. Tr. 3/20, **ECF No. 90** at 86:3-20; **ECF No. 117-35** (Gov't Exhibit 42) at 1. As promised, on August 20, 2021, the Municipality issued out a check to Island

---

[22] More specifically, Santamaría's wife's car. Tr. 3/20, **ECF No. 90** at 81:8-9.

[23] Although his feet were out of frame, the video showed Pérez-Otero moving his arms and legs in a manner consistent with putting the envelope in one of his socks. *See* Gov't Exhibit 37-1.

Builders for the amount of $440,784.91. Tr. 3/20, **ECF No. 90** at 87:3-16; **ECF Nos. 117-33** (Gov't

Exhibit 39) and **117-82** (Gov't Exhibit 82).

Finally, the Court is compelled to highlight that the jury, through the videos submitted

by the government, was able to observe telling details on the way Pérez-Otero received

Santamaría's cash payments. In all three meetings, every time Santamaría hands Pérez-Otero

the white envelope with the $5,000, neither him nor Pérez-Otero ever acknowledge that the

hand-off is happening. Pérez-Otero simply receives the envelope and immediately puts it away

while talking about other matters, *as if guided by a prior understanding*. Moreover, during the May

19, 2021 meeting, Santamaría literally hands Pérez-Otero the envelope *under the table* where they

are seating opposite of each other. And, as mentioned above, he puts the envelope received in

the August 19, 2021 meeting *in his sock* prior to walking into City Hall. In none of the recorded

meetings does Pérez-Otero ever open the envelope, ask Santamaría what it is for, or even count

the money inside. All of this is strongly indicative that a clear, pre-existing understanding

underlay each of the three cash payments, which Santamaría testified were done in much the

same manner as his prior payments to Pérez-Otero.

With all of the above evidence laid out, could a reasonable jury conclude that a *quid pro

quo* agreement existed between Santamaría and Pérez-Otero? The answer, in this Court's view,

is a resounding yes. Although no small part of the evidence is circumstantial, "the criminal law

does not place a special premium on direct evidence." *United States v. O'Brien*, 14 F.3d 703, 706

(1st Cir. 1994). "The evidence in a criminal case should be viewed in its totality… for evidence—particularly circumstantial evidence—often has an exponential effect. After all, the sum of an evidentiary presentation may well be greater than its constituent parts." *Id.*, at 707 (cleaned up). Moreover, "a defendant's intent can be inferred from his conduct, seen in the light of all the surrounding circumstances." *United States v. DiMasi*, 810 F. Supp. 2d 347, 353 (D. Mass. 2011) *aff'd sub. nom. United States v. McDonough*, 727 F. 3d 143 (1st Cir. 2013) (cleaned up). In "cases in which it is alleged that public officials have corruptly sold the powers of their office," this principle carries "special relevance." *Id.*[24]

The totality of the evidence here is sufficient to support a finding that Pérez-Otero received and accepted $5,000 cash payments from Santamaría since late 2018 or early 2019 with the intent of being influenced in relation to his office, and that Santamaría gave Pérez-Otero these payments with the intention of obtaining favorable treatment in his efforts to obtain municipal contracts with the Municipality of Guaynabo and prompt payment thereon.

---

[24] In *DiMasi*, the U.S. District Court in Massachusetts quoted at length the Second Circuit's justification for this "special relevance," incorporated here for its appropriateness:

> [E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. *Cf. United States v. Manton*, 107 F.2d 834, 839 (2d Cir. 1939) ("often if not generally, direct proof of a criminal conspiracy is not available"), *cert. denied*, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.

*DiMasi*, 810 F. Supp. 2d at 353 (quoting *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988)).

Consistent therewith, as testified by Santamaría, within a few months of starting to make the payment, he initiated conversations with Pérez-Otero about possible contracts being awarded to his companies. This *quid pro quo* agreement is reflected not only in Santamaría's testimony of his expectations of the agreement, which the jury was entitle to credit, but also in the supporting evidence submitted by the government that showed or implied that Pérez-Otero acted in accordance with these expectations. Therefore, the jury was more than justified in concluding that there existed a *quid pro quo* agreement between Santamaría and Pérez-Otero wherein the former would periodically pay the latter $5,000 for his assistance, as mayor, in obtaining municipal contracts in his Municipality as opportunities arose, and for prompt payment thereon, as charged.

### D.    Pérez-Otero's other arguments for acquittal.

Having determined that the evidence was sufficient to establish the existence of a *quid pro quo* agreement, the Court now turns to Pérez-Otero's remaining arguments. As summarized above, Pérez-Otero argued that (i) there was no illegality in the Municipality's contracting relationship with Island Builders; (ii) that the actions he did take in relation to Santamaría and Island Builders were not official acts under *McDonnell v. United States*, 579 U.S. 550 (2016); and (iii) that the cash payments were not bribes but gratuities, which are not criminalized under 18 U.S.C. § 666(a)(1)(B). His first two arguments are related, as they concern evidence of acts Pérez-

Otero may or may not have taken in relation to Santamaría and Island Builders. The Court will analyze these two together and then his gratuities argument.

> ### 1.  Pérez-Otero's "official acts".

Pérez-Otero contends that the procurement process for the award of Island Builders' contract was duly authorized by the Municipal Assembly, that Island Builders was the lowest-priced competitor in that process, that De Jesús did not receive any inside information during the proposal process, and that the work was competently performed. **ECF No. 106** at 11. He also argues that Island Builders was not awarded all the contracts it competed for in Guaynabo, and that he could have lawfully given Santamaría the waste transfer station contract himself but did not do so. *Id.* Finally, Pérez-Otero argues that none of the actions the evidence shows he took qualify as official acts under *McDonnell v. United States*, 579 U.S. 550 (2016).

It is not altogether clear what Pérez-Otero purports to establish with these supposed facts, as they are of little relevance to the validity of the guilty verdict. After all, Pérez-Otero was not found guilty here of violating municipal procurement processes, but of receiving and accepting bribes in relation to the municipal contracts sought by Santamaría. That he did or did not personally carry out the listed acts has little to no bearing on those acts the jury reasonably concluded he did perform or caused to be performed. And the jury could have reasonably concluded that these actions were taken as part of the *quid pro quo* agreement detailed above.

Under *McDonnell v. United States*, 579 U.S. 550 (2016), as mentioned above, an official act can be a decision or action entailing the use of an official position to exert pressure on another official to perform an official act. *McDonnell*, 579 U.S. at 574. Key here is that the public official does not need to actually perform the official act, or even have the ultimate authority to perform it, in order to commit extortion under color of official right.

> [I]t is irrelevant that [the public official] lacked (and that [the payor] knew she lacked) the ultimate authority to issue permits or otherwise affect his government business; [the public official], in her official capacity, had the power to facilitate [the payor's] government business, and it was that power that [the payor] paid her to exercise.

*United States v. Rivera Rangel*, 396 F.3d 476, 485 (1st Cir. 2005) (citing *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) ("Actual authority over the end result ... is not controlling if [defendant], through his official position, had influence and authority over a means to that end.")). As a result, even if Pérez-Otero were able to establish that he did not take or could not take any action to favor Santamaría or Island Builders, what matters is the agreement to do so.

Here, there was enough testimony for a reasonable jury to find that Pérez-Otero wielded enough influence in the Municipality to exert pressure on the members of the bid board to award Island Builders the Río Ward contract, which would be an official act under *McDonnell*. The testimony of the former mayor of Cataño is relevant in this regard. As mentioned previously, he testified about a similar bribery scheme he ran in his municipality for the benefit of Santamaría and his companies, describing in detail how he, being mayor, had ultimate authority on the

awarding of municipal contracts in Cataño. Tr. 3/17, **ECF No. 86** at 52:4 to 54:10. He explained how he could exert this authority through the designation of people who were of his trust to the bidding board and to municipal agencies, such as the public works department. *Id.*, at 93:16 to 98:14. Once there, he could exert influence over who got municipal contracts, a process which benefitted Santamaría and his companies in that municipality.

Also relevant is a portion of the conversation Santamaría and Pérez-Otero held in their August 19, 2021 meeting. Pérez-Otero recounts to Santamaría how he planned to exclude a waste disposal company from participating in contracts with the Municipality because they had challenged in state court his award to a different company of a previous contract. *See* **ECF No. 117-30** (Gov't Exhibit 36) at 4-5. Santamaría—who expressed a strong interest in obtaining a waste transfer station contract with the Municipality—understood that if Pérez-Otero wanted to, he could exclude him from doing business in the Municipality. *See* Tr. 3/20, **ECF No. 90** at 82:10-23 (after watching and listening to the exchange on video: "Q. And who decides who can compete in these bidding processes? A. The mayor."); *see also id.*, at 96:21 to 97:4 ("If I stop[ped] making the payment it would – I did not know at that moment how he would act. So I was getting contracts, I was getting jobs, and I didn't want him to think that I was not helping.").

The jury also heard from several witnesses how Pérez-Otero had individuals of his personal trust in the Municipality's bid board and as head of municipal agencies. Mr. Eduardo Rafael Faria-Rodríguez, the current Deputy Mayor of Guaynabo, testified that the president of

the Municipality's bid board at the time Island Builders was awarded its Río Ward contract was Raúl Torres-Gómez. Tr. 3/16, **ECF No. 85** at 49:24 to 50:8. Mr. Torres-Gómez was also Director of the Municipality's Economic Development Office. *Id.*, at 50:9-13. Notably, Mr. Torres-Gómez just so happened to be the former husband of Pérez-Otero's wife and Guaynabo's then-first lady, Liza Fernández, and maintained a close friendship with them prior to and during Pérez-Otero's tenure as mayor. *Id.*, at 50:16 to 51:1; *see also* Tr. 3/21, **ECF No. 95** at 60:6-9; 69:79.

   In addition, the Director of the Municipality's Public Works Department was Wilfredo Martínez-Vazquez, also a close friend of Pérez-Otero and an *ex officio* member of the Municipality's bid board. Tr. 3/16, **ECF No. 85** at 51:18 to 52:13; Tr. 3/21, **ECF No. 95** at 61:9-20. He was appointed to his position by Pérez-Otero in September of 2017 but had not worked at the Municipality beforehand. *Id.* The Director of the Finance Department, Edwin Reyes-González, was also appointed by Pérez-Otero and was new to the Municipality. *Id.*, at 53:7 to 54:3. As Director of Finance, he held the other *ex officio* seat in the bid board. Tr. 3/21, **ECF No. 95** at 79:15-18. The Municipality's Director of the Transportation Department, Alexis Durán-Gómez, was also part of the bid board. *Id.*, at 69:22 to 70:3. Mr. Torres-Gómez—the only witness called by Pérez-Otero—identified Durán-Gómez on cross-examination in several photographs alongside Pérez-Otero, Liza Fernández, Wilfredo Martínez and himself, among others, in various social activities (including a cruise ship trip). *See id.*, at 70-78; **ECF No. 117-84** through **117-91** (Gov't Exhibits 90 through 95). Mr. Torres-Gómez testified that Durán-Gómez was

married to Martínez-Vazquez's sister, making them brothers in law. *See* Tr. 3/21, **ECF No. 95** at 72:2-12. Given the above, a jury could reasonably conclude that Pérez-Otero had close personal ties of friendship and trust with at least four members of the Municipality's bid board, one of which was the Director of the Public Works Department.

Finally, Mr. Faria-Rodríguez testified that before being deputy mayor in the current municipal administration, he held the position of "Attorney III" in the Municipality's Office of Legal Affairs. Tr. 3/16, **ECF No. 85** at 42:20 to 43:15. As part of his duties as "Attorney III," he prepared a draft version of the Río Ward contract. *Id.*, at 66:4-14. He testified that during this process, he found some irregularities in the materials he reviewed and noted that some required documentation was missing, observations that he forwarded to the head of his office, Attorney Fernando Pérez-Del Valle. *Id.*, at 66:23 to 64:7 and 69:10-25. Mr. Pérez-Del Valle, like Mr. Torres-Gómez and Mr. Reyes-González, had not previously worked in the Municipality before his appointment as an agency director. *Id.*, at 78:8-18. But Mr. Pérez-Del Valle was appointed by Pérez-Otero and had previously been involved as an attorney in the divorce proceedings between then-first lady Liza Fernández and Mr. Torres-Gómez. *Id.*, at 79:8-17. Mr. Faria-Rodríguez testified that upon receiving his observations on the contract, Mr. Pérez-Del Valle requested the draft of the contract and released him from working on it any further. *Id.*, 75:21-24 and 77:10 to 78:7. The contract, as noted previously, would eventually be signed on June 10, 2020.

This network of close confidants, appointed to high-ranking positions of power in the Municipality and the bid board, comports with what the mayor of Cataño testified was an essential element of a municipal bribery scheme. Coupled with the evidence that the Court has already expounded on at length—that Pérez-Otero expressed his willingness to award a contract to Santamaria, informed him beforehand of the upcoming Río Ward and waste transfer station projects, assured him that he would handle the proposed cutting of the asphalt portion of Island Builder's contract (an issue that later "simply went away"), took action to cause the release a $440,784.91 payment to Island Builders, alerted Santamaría to an upcoming pre-proposal meeting for additional construction work, and warned and gave Santamaría the opportunity to deny rumors being spread by competing firms in the Municipality about Island Builder's capacity to perform—it all serves as sufficient basis for the jury to have concluded that Pérez-Otero could deliver, and did in fact deliver, on his side of the bargain with Santamaría. In other words, the cumulative effect of this evidence entitled the jury to find that Pérez-Otero had the ability pursuant to his office to act (and did in fact act) or to influence other public officials' actions to favor Santamaría's companies as part of his end of the *quid pro quo* agreement.

For these reasons, the Court finds that the evidence was sufficient to meet the official act requirement of *McDonnell*.[25]

---

[25] As pointed out above, the government objects to the inclusion of "official act" as an element of Count Two. But because the Court finds that the *quid pro quo* agreement between Santamaría and Pérez-Otero included the latter's performance of official acts, it need not decide this matter.

>    **2.      Cash payments as gratuities.**

Finally, Pérez-Otero raised for the first time in his written motion the argument that the cash payments he received from Santamaría were not bribes, but gratuities that do not fall under the purview of 28 U.S.C. § 666(b)(1). See *United States v. Bravo-Fernández*, 722 F.3d 1 (2013). Pérez-Otero posits that a bribe must precede the official act, but that the cash payments that took place in May, July, and August of 2021 came *after* Island Builders was awarded its contract. This argument, however, fails for several reasons.

First, the First Circuit has been clear in the distinction between what is a bribe and what is a gratuity: "The essential distinction between a bribe and a gratuity is that a bribe requires a quid pro quo, the exchange of something of value for influence over some official conduct of the recipient." *United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013) (citing *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993)). A gratuity thus lacks the *quid pro quo* element—as relevant here, the intent of a public official to be influenced as to some government business or transactions in exchange for payment of something of value. As outlined above, there was ample evidence for the jury to conclude that a *quid pro quo* agreement existed between Santamaría and Pérez-Otero, that Santamaría made the cash payments with the intent to influence Pérez-Otero, and that Pérez-Otero surreptitiously received them with the intent to be influenced in relation to municipal contracts. That is enough to distinguish the cash payments from mere gratuities.

Second, for it to be a bribe, it is not the payment that must precede the official act, but the agreement: "The core difference between a bribe and a gratuity is not the time the illegal payment is made, but the *quid pro quo,* or the agreement to exchange a thing of value for official action." *Bravo-Fernández*, 722 F.3d at 19 (quoting *United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998)) (cleaned up); *United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022). Here, the jury could have reasonably concluded that the agreement between Santamaría and Pérez-Otero dated back to when Santamaría first approached Pérez-Otero and began making the cash payments in late 2018 or early 2019. Island Builder was awarded its contract with the Municipality later, in June of 2020. Thus, the agreement clearly preceded the bribes. "[A]s long as the agreement to exchange a thing of value for an official act is made before the act is performed, the requisite quid pro quo is established." *Correia*, 55 F.4th at 31.

Third, the evidence that Pérez-Otero performed acts in connection with the charged bribery scheme after he had received the last of the three cash payments in 2021 is pellucid. As further detailed in section III.C, *supra*, Pérez-Otero alerted Santamaría on August 27, 2021, of the need to send an Island Builders representative to the pre-proposal meeting in order to get the third amendment to the Río Ward contract, which was awarded in October of that same year. Pérez-Otero, most notably, took concrete action to get the Municipality to release the $440,784.91 payment to Island Builders on August 20, 2023. All three cash payments charged in Count Two

preceded these two acts, so, by Pérez-Otero's own logic, they cannot be classified as after the fact gratuities.

Lastly, the bribes paid by Santamaría to Pérez-Otero to either regain his trust after the 2017 elections and later to ensure the award of contracts, were periodic and ongoing since late 2018 or early 2019, so isolating any one payment as after-the-fact gratuities ignores the existence of the agreement and the established pattern of conduct of periodic cash payments in exchange for benefits. *See United States v. McDonough*, 727 F.3d 143, 154 (1st Cir. 2013) ("Bribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are *in exchange for* a pattern of official actions favorable to the donor.") (cleaned up).

For all the above reasons, the Court concludes that the bribes received by Pérez-Otero from Santamaría cannot be considered as gratuities.

## IV.    Conclusion

Public corruption has long been a perennial scourge not only on the people of Puerto Rico, but on society in general. Pérez-Otero's case is just one in a recent line of cases involving similar bribery schemes across the Island's city halls. This type of corruption often reflects, as it does here, an ethos of personal enrichment at the expense of the public trust—one that has seemingly taken hold in the Island's political class. Once the government uncovers the choking weed of public corruption, the individual so charged is constitutionally entitled to due process

and a fair trial, and it is the Court's task to ensure that the jury's verdict is reasonably supported by the evidence. Based on the evidence at trial and a review of the record, this Court finds that there is overwhelming support for the jury's verdict. Once this point is reached, public trust can only be restored by ensuring all parties—that is, defendants and society—that the law is faithfully, fairly, and evenly applied without hesitation.

Here, the evidence presented to the jury was sufficient to convict Pérez-Otero of conspiring and engaging in federal program bribery and in engaging in extortion under color of official right. It showed that, as Mayor of Guaynabo, Pérez-Otero agreed to use and used his authority and influence to benefit Oscar Santamaría in exchange for payments in cash. For this reason, the Court **DENIES** Pérez-Otero's motion for acquittal at **ECF No. 106**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 7th day of February, 2023.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**